BARNES, J.,
 

 for the court.
 

 ¶ 1. John Minter filed a petition in the Lamar County Chancery Court seeking modification of the primary physical custody of his minor son, John Clayborn Minter (“Clay”), from his former wife, Phyllis Minter, to him. The chancery court issued an agreed order, whereby temporary physical custody of Clay was transferred to John, with Phyllis receiving standard visitation. After a hearing on the matter, custody was modified, with John receiving permanent physical custody of Clay. Finding no reversible error, we affirm.
 

 STATEMENT OF FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. Phyllis and John married in February 1998. One child, Clay, was born of the marriage in July 1999. The Chancery Court of Lamar County granted a judgment of divorce based on irreconcilable differences in August 2000. The parties agreed to share legal custody of Clay, with Phyllis having primary physical custody and John having standard visitation, which consisted of every other week from Thursday through Sunday. The court also ordered John to pay $200 per month in child support.
 

 ¶ 3. After the divorce, Phyllis was living in Opelousas, Louisiana, at her father’s house, and John was living in Hattiesburg, Mississippi. Once Clay began pre-kinder-garten, John testified that he would pick Clay up every other Friday and return him to Phyllis on Sunday. There were no problems with the custody arrangement until May 2005, when John petitioned the chancery court for modification of custody, mainly because Clay had to repeat kindergarten due to thirty-five absences in one year while under Phyllis’s custody. John also claimed Phyllis failed to provide Clay with suitable, stable living quarters; she used drugs; cohabited with men to whom she was not married; and did not cooperate with John about transporting the child between Mississippi and Louisiana for visitation.
 

 ¶ 4. In August 2005, the chancery court entered a temporary order, whereby the parties were ordered to submit to hair follicle and urinalysis drug tests.
 
 [1]
 
 Also, the court appointed Dr. John Galloway, a licensed marriage and family counselor and social worker, to evaluate Clay’s health and well-being and make a recommendation to the court concerning Clay’s custody. In January 2006, temporary physical custody of Clay was transferred to John through an agreed order. Clay has remained in John’s custody since that time, with Phyllis maintaining standard visitation rights.
 

 ¶ 5. The chancery court held hearings in June and October 2007. Testimony showed both parties had lived in numerous locations and had held several jobs since the divorce. At the time of the divorce, Phyllis was living in Hattiesburg, but she later moved to Louisiana and stayed at her father’s house in Opelousas for approximately one year. She then moved to an apartment in Lafayette, Louisiana for eight months. Because her father was dying of cancer, Phyllis moved back to his house to care for him. During this time, Phyllis gave birth to her second child, Jacob, in December 2002. Phyllis had the child out of wedlock; she had dated the father of the child for six months. Phyllis
 
 *843
 
 testified Jacob’s father has no active participation in his son’s life.
 

 ¶ 6. Phyllis continued to live with her father for approximately two years until he died; then she, Clay, and Jacob moved in with her brother, who had a larger mobile home nearby, for approximately one year. Next, she moved in with her sister in Geismar, Louisiana for eight months, while she waited for an apartment in Baton Rouge to become available. Five people were staying in a three-bedroom residence: Clay and Jacob had one bedroom; Phyllis her own bedroom; and Phyllis’s sister and aunt slept in one room. Once the apartment became available, Phyllis moved to Baton Rouge for one year. Phyllis’s latest residence was a two-bedroom mobile home in Prairieville, Louisiana. She resides in one bedroom, with Jacob and Clay (when she has custody) sharing another bedroom. She has several relatives who live nearby.
 

 ¶ 7. As for employment, at the time of the divorce, Phyllis was working for H & R Block and for an attorney in Hatties-burg. She had also worked at a Cracker Barrel restaurant at some point since the divorce. She then worked at a seafood company, followed by Teche Electric in Lafayette for one year, where she was laid off. At this time she also became pregnant with Jacob; so, she did not work until she had him. Next, she worked at a T-shirt printing company for a few months until she moved to Baton Rouge, where she worked for a church daycare for about five months, and then another daycare for a year. At the time of the final judgment, Phyllis had woidced at Tonya’s Kids, another daycare, in Gonzalez, Louisiana, for more than two consecutive years.
 

 ¶ 8. John, too, has lived in various locations. At the time of the divorce, John was living in Hattiesburg. One month later, he moved to another location in Hat-tiesburg for fourteen months; then he lived with and assisted his grandmother for approximately three years. John moved to another address for approximately a year and one half, until he bought his current house in Petal, Mississippi, which is a three-bedroom home with a fenced-in backyard. He noted that he has only lived in two places since receiving custody of Clay.
 

 ¶ 9. Additionally, John has held numerous jobs since the divorce. At the time of the divorce, John worked for Deviney Construction for three months. To make more money, he left this job to work on a construction site in Baton Rouge. He worked at this job until the project was completed — approximately eight weeks. During this time, John still maintained a residence in Hattiesburg. In 2002, John collected unemployment. He then returned to Hattiesburg and worked for various contractors as a painter. At the time of the hearing, he was self-employed, and for the past three years, he has operated a paint-contracting company. He employs three to four individuals and has flexible hours.
 

 ¶ 10. Regarding Clay’s education, he attended numerous schools while in Phyllis’s custody. Clay started out in prekindergarten at a public school in Opelou-sas. Phyllis claimed that she was happy with the school, but John did not want Clay in public school; so they moved Clay to kindergarten at New Hope Christian Academy. John refutes this and claims Phyllis was the one who had complained about the public school. John paid the tuition at New Hope.
 

 ¶ 11. Testimony conflicted regarding the explanation of Clay’s thirty-five unexcused absences at the private school. John blamed Phyllis, and Phyllis blamed John. Phyllis and her sister claimed the absences were due to John’s picking Clay
 
 *844
 
 up every other Thursday morning pursuant to the visitation schedule in the chancellor’s final judgment, which was entered before Clay started school, instead of waiting until Friday afternoon when school was over. John and his mother testified, however, that once Clay was in kindergarten, John did not pick Clay up until school let out on Friday, and that John caused Clay to miss only one day of school. Phyllis admitted she never objected to or sought to have the visitation schedule changed, because John would verbally and physically threaten her if she disobeyed him. Phyllis also stated that the teachers at New Hope were of poor quality; they were not certified and were just hired “off the streets.” John claims that they both knew the teachers at the private school were not certified, and he agreed to the change in schools to make Phyllis happy.
 

 ¶ 12. After New Hope and while still in Phyllis’s custody, Clay attended Grand Prairie Elementary from August 2005 to October 2005. Records indicate he missed four days of school. Clay then attended Dutehtown Primary from October 2005 to December 2005, apparently because of Phyllis’s moving. John was then granted temporary custody in January 2006, and Clay attended Thames Elementary, where he was on the honor roll and was promoted to first grade. Then, John moved to Petal where Clay attended Petal Elementary and was, at the time of the hearing, making good grades and had no absences.
 

 ¶ 13. Also testifying at the hearing was Dr. Galloway, who has a Ph.D. in sociology. After voir-dire examination, Phyllis’s counsel objected to Dr. Galloway’s acceptance as an expert in the fields of counseling, sociology, and social work, but the chancellor overruled the objection. Dr. Galloway wrote an initial two-page report to the court in October 2005, after having met with John twice and Phyllis once; the report was entered into evidence at the June 2007 hearing. In it, Dr. Galloway explained that Phyllis came across as having had a “very difficult life.” He opined that Clay should be receiving better attention from Phyllis. As time passed, John and Clay were doing more activities together, with Clay’s becoming closer to his father. Dr. Galloway found no evidence of abuse or drug use on John’s part, as Phyllis had complained. By the time of the June 2007 hearing, Dr. Galloway had met with John five times (three of which Clay was present) and Phyllis once. He opined that Phyllis, through her affect, demeanor, presentation, and history, “demonstrated an inability to take care of herself, projects blame onto other people and prefers to rely on other people to handle things for her.” He concluded she was not a fit parent at that time.
 

 ¶ 14. Regarding his meetings with Clay, Dr. Galloway found him reluctant to talk at first, but eventually Clay became more outgoing and expressed a desire to be around his father. Dr. Galloway determined that John was a good role model for Clay, who enjoyed life with his father.
 

 ¶ 15. Additionally, for the first time at the hearing, Phyllis accused Dr. Galloway of being independently hired by John before being appointed by the court. John’s counsel denied this accusation; however, Phyllis’s counsel contended that Dr. Galloway had actually had a meeting with John in January 2005, seven months before he was appointed by the court. Dr. Galloway’s handwritten notes, which were admitted into evidence, did indicate a meeting in January 2005, but Dr. Galloway was unsure whether he first met with John in January 2005 or 2006; he explained that his notes might have had a scrivener’s error regarding the year. It was undisputed that John was responsible for paying all of Dr. Galloway’s fees for the evaluation
 
 *845
 
 pursuant to the court order, since Phyllis had limited funds.
 

 ¶ 16. The chancellor noted that Phyllis’s counsel did not object prior to trial through a motion in limine to exclude Dr. Galloway as an expert witness. The chancellor also explained that, having observed Dr. Galloway for several years testifying in court, he was always objective and fair in his opinion regarding the best interest of the child. Therefore, the chancellor did not find any bias present, even if John may have met independently with Dr. Galloway one time.
 

 ¶ 17. Phyllis tendered Eliot Levin as an expert witness in the field of clinical social work and custody evaluation at the October 2007 hearing. Phyllis hired Levin to assist her and Clay in what Phyllis perceived as Clay’s emotional difficulties related to the custody and visitation situation. Phyllis also asked Levin to review Dr. Galloway’s two-page report. Levin testified that after meeting with Phyllis for approximately four hours and with Clay for approximately one hour, he determined that Dr. Galloway’s custody report was “garbage.” Levin claimed Dr. Galloway did not interview “peripheral resources” or Phyllis and Clay sufficiently. Additionally, he found Dr. Galloway’s report was too general. Levin claims Clay’s stuttering is treatable, but his condition is worsening due to the stress of the custody arrangement. Levin made his opinion under the presumption that both Phyllis and John were good parents; however, he never met with John and did not review Dr. Galloway’s trial testimony. Levin opined that Phyllis was a passive person for voluntarily signing the temporary order granting John custody; Levine contended that Phyllis was “bullied” into signing the temporary order by her attorney at that time.
 

 ¶ 18. John entered calendars into evidence showing the numerous dates he kept Clay before the child started school when Phyllis still had primary custody.
 
 [2]
 
 John described his relationship with Clay as “real close,” with Clay being his number one priority. For the year and one half since John has had custody, he typically drives Clay to school, picks him up from school, helps with Clay’s homework, accompanies him to extracurricular activities after school (including karate, soccer, swimming lessons, and baseball) and generally provides a highly structured environment. John claims to have many family members near his residence. John also arranged for Clay to receive speech therapy from the Petal Public Schools twice per week. John admitted that the program may not have been as effective as possible, and he pledged to enroll Clay in a more specialized local speech-therapy program.
 

 ¶ 19. Phyllis testified that Clay’s speech difficulties had worsened since John received temporary custody of Clay. She had obtained placement for Clay in a speech-therapy program at Louisiana State University, approximately one hour from her home, if she got custody. Phyllis also admitted that her drivers’ license had been suspended since 2001 due to an unpaid traffic ticket. She claimed she “thought it was taken care of,” and presumably took care of it the week of the June 2007 hearing. Phyllis also admitted to pleading guilty and paying restitution on a bad check. Since the divorce, Phyllis said that she has not had any live-in relationships or extended stays with unrelated men. She stated Clay and Jacob’s relationship is “very close.” When she had custody of
 
 *846
 
 Clay, he engaged in T-ball, baseball camp, and Bible camp. Phyllis acknowledged she had been relying on food stamps for several years for her and Jacob in order to make ends meet. She admitted agreeing to grant John temporary custody of Clay in December 2005, but she claims her attorney at the time misinformed her on the law.
 

 ¶ 20. Clay’s first-grade teacher in Petal testified that Clay was doing very well in school under his father’s custody and that John appears to be involved and interested in Clay’s education. She stated Clay is one of the top students in his class, consistently completes all of his homework, and has been tested for the school’s gifted program. He also received an award from his teacher for “most cooperative” student.
 

 ¶ 21. Phyllis’s supervisor at her current employer, Tonya’s Child Care, testified that Phyllis has great rapport with the approximately eight children, who are between the ages of one year and sixteen months, under her care. The supervisor described Phyllis as being “one of our best employees.” The supervisor also testified she would be concerned with the quality of parenting if' a child had to repeat kindergarten because of thirty-five unexcused absences. At the time of the hearing, Phyllis worked from 7:00 a.m. until 6:00 p.m., five days a week, but her supervisor stated she could change her hours from 7:00 a.m. until 4:30 p.m. Phyllis further added that if granted custody, Clay could attend her daycare’s before-and-after-school programs.
 

 ¶ 22. Phyllis’s sister, Gloria Deville, testified that she and their brother, Chad Deville, live within five miles of Phyllis. Gloria maintained that once Clay started kindergarten, John kept the court-ordered visitation, picking Clay up on Thursday nights. Therefore, Clay was missing kindergarten on Thursday, Friday, and sometimes Monday; however, she was not certain this happened every time. For Phyllis’s visitation period, Gloria usually picked Clay up from John’s custody on Fridays because of Phyllis’s work hours.
 

 ¶ 23. John’s mother, Connie Chisholm, testified about John’s family and support network in the Hattiesburg area. She stated that John picked Clay up from Phyllis on Thursdays until Clay began kindergarten; then, John voluntarily limited his visitation to commence alternate Fridays, not Thursdays, so Clay would not miss school. Chisholm, who is the owner and director of a child-care center, stated she would keep Clay whenever John was working.
 

 ¶ 24. On May 29, 2008, the chancery coui’t entered a final judgment, granting John permanent physical custody of Clay. Phyllis now timely appeals, raising the following issues: (1) the chancellor erred in applying the
 
 Riley
 
 test for custody modification; (2) the chancellor erred in performing an
 
 Albright
 
 analysis as there was no material change in circumstances adverse to Clay; (3) the chancellor erred in finding the majority of
 
 the Albright
 
 factors favored John, not Phyllis; and (4) the chancery court erred in considering the expert testimony of Dr. Galloway.
 

 STANDARD OF REVIEW
 

 ¶ 25. Our standard of review for child custody cases is very limited.
 
 Johnson v. Gray,
 
 859 So.2d 1006, 1012(¶ 31) (Miss.2003). In order for this Court to reverse, the chancellor must be “manifestly wrong, clearly erroneous, or apply an erroneous legal standard.”
 
 Id.
 
 (citing
 
 Mabus v. Mabus,
 
 847 So.2d 815, 818(¶ 8) (Miss.2003)). The chancellor’s findings of fact may not be set aside or disturbed on appeal if they are supported by substantial, credible evidence.
 
 Id.
 
 (citing
 
 Maras-
 
 
 *847
 

 calco v. Marascalco,
 
 445 So.2d 1380, 1382 (Miss.1984)).
 

 ANALYSIS
 

 1. Material Change in Circumstances
 

 ¶ 26. The law on custody modification is well established. “[A] non-custodial party must prove [that]: (1) there has been a substantial change in circumstances affecting the child; (2) the change adversely affects the [child’s] welfare; and (3) a change in custody is in the best interest of the child.”
 
 Johnson,
 
 859 So.2d at 1013(¶ 33) (citing
 
 Bredemeier v. Jackson,
 
 689 So.2d 770, 775 (Miss.1997)). The totality of the circumstances must be considered in determining whether there was a material change in circumstances.
 
 Mabus,
 
 847 So.2d at 818(¶ 8) (citing
 
 Bredemeier,
 
 689 So.2d at 775). Furthermore, it is well settled that the polestar consideration in any child custody matter is the best interest and welfare of the child.
 
 Id.
 
 (citing
 
 Albright v. Albright,
 
 437 So.2d 1003, 1005 (Miss.1983)).
 

 ¶ 27. In his final judgment modifying custody, the chancellor cited
 
 Riley v. Doerner,
 
 677 So.2d 740, 744 (Miss.1996), where custody was modified based on an improvement in the noncustodial parent’s living condition.
 
 Riley
 
 acknowledged that “a change in circumstances of the non-custodial parent does not, by itself, merit a modification of custody.”
 
 Id.
 
 (citing
 
 Duran v. Weaver,
 
 495 So.2d 1355, 1357 (Miss.1986)). However, the
 
 Riley
 
 court went on to hold that, while not abandoning the material-change-in-eircumstanees standard, “when the environment provided by the custodial parent is found to be adverse to the child’s best interest,
 
 and
 
 that the circumstances of the non-custodial parent have changed such that he or she is able to provide an environment more suitable than that of the custodial parent,” custody may be modified.
 
 Id.
 

 ¶ 28. Phyllis argues that the chancellor erred in applying
 
 Riley
 
 to find custody could be modified. Phyllis explains that
 
 Riley
 
 holds it still must first be shown that there is a material change in circumstances and that the custodial parent’s environment is adverse to the child’s best interest. She contends there are no such facts in the case at bar justifying such a finding. Thus, she concludes the custody modification was inappropriate.
 

 ¶ 29. First, we note that the chancellor did not rely on the test in
 
 Riley
 
 alone; in his opinion, he initially cited the traditional three-part test for modification — a material change has occurred which is adverse to the child, where a change is in the child’s best interest.
 
 See Johnson,
 
 859 So.2d at 1013(¶ 33). He properly noted that in determining whether a material change in circumstances had occurred, the relocation of a parent, in and of itself, is insufficient.
 
 See Giannaris v. Giannaris,
 
 960 So.2d 462, 468(¶ 11) (Miss.2007). The chancellor then cited to
 
 Riley,
 
 but he did not provide any analysis as to how the facts of this case applied to Riley’s holding. Therefore, we disagree with Phyllis’s contention that the chancellor improperly based his decision entirely on
 
 Riley.
 

 ¶ 30. Second, we agree with Phyllis that the alternative
 
 Riley
 
 test is not applicable in this case. In
 
 Riley,
 
 the supreme court affirmed a chancellor’s decision to transfer custody of a minor child from the mother to the father, even though the chancellor found the father had not met the traditional test for modification.
 
 Id.
 
 at 745. Testimony showed: the mother had moved several times; the child had attended several different schools due to the moves; the child had failed first grade; the mother was sporadically employed; her income was supplemented by food stamps and other government assistance; and she had
 
 *848
 
 lived with men prior to and subsequent to her current live-in boyfriend, who admitted he" occasionally smoked marijuana.
 
 Id.
 
 at 742. The chancellor in
 
 Riley
 
 reasoned that although he believed it was in the best interest of the child to live with her father due to the negative “totality of circumstances” surrounding the mother, he could not transfer custody because there had been no material change in circumstances since the original judgment and no measurable adverse affect on the child. However, the chancellor conditioned his ruling on both parents passing regular drug tests, and when the mother ultimately tested positive for marijuana use, the chancellor then transferred custody to the father.
 
 Id.
 
 The supreme court found it within the chancellor’s discretion to do so as the mother’s home had been the site of illegal drug use and other behavior adverse to the child’s welfare, and that the father’s circumstances had improved since the original decree.
 
 Id.
 
 at 745. The supreme court stressed “a chancellor is
 
 never
 
 obliged to ignore a child’s best interest in weighing custody change”; instead, the chancellor should consider it “above all else .... ‘we never depart from our polestar consideration: the best interest and welfare of the child.’ ”
 
 Id.
 
 at 744 (quoting
 
 Ash v. Ash,
 
 622 So.2d 1264, 1266 (Miss.1993)).
 

 ¶ 31. The situation in
 
 Riley
 
 is factually distinguishable from the instant case.
 
 [3]
 

 While
 
 there are some similarities, such as Phyllis’s frequent moves and Clay’s attendance at numerous schools, her frequent job changes, Clay’s failing kindergarten, and Phyllis’s reliance on food stamps, there was no frequent and ongoing cohabitation with men or drug use here. Phyllis testified that she had not cohabited with men since the divorce, even after giving birth to a child out of wedlock, and there was no evidence of drug use by her or any individual living with her. Most importantly, however, we find that, unlike
 
 Riley,
 
 custody was modified based on the traditional test of custody modification.
 

 ¶ 32. Regarding the first prong of the traditional test, “[t]he burden of proof is on the movant to show by a preponderance of the evidence that a material change in circumstances has occurred in the custodial home.”
 
 Johnson,
 
 859 So.2d at 1014(¶ 37) (quoting
 
 Mabus,
 
 847 So.2d at 818(¶ 8)). Professor Deborah H. Bell, in her treatise on family law’-, notes that “[ejvents which would not, alone, be a sufficient material change may in combination provide a basis for modifying custody.” Deborah H. Bell, Bell on Mississippi Family Law § 5.11(5) (Supp.2008);
 
 see also Duke v. Elmore,
 
 956 So.2d 244, 248(¶ 8) (Miss.Ct.App.2006) (cohabitation with a convicted felon for ten months in the presence of the child before marrying him, the
 
 *849
 
 mother’s sporadic employment, and her changing residences four times in two years since the divorce all constituted a material change);
 
 Hill v. Hill,
 
 942 So.2d 207, 210—11(¶ 16) (Miss.Ct.App.2006) (in the totality of the circumstances, cohabitation with numerous men, inconsistent living situations, and “risk-taking” behavior were found to constitute sufficient material change in circumstances). As to the second prong, the material change must adversely affect the child.
 
 Johnson,
 
 859 So.2d at 1013(¶ 33) (citing
 
 Bredemeier,
 
 689 So.2d at 775). Again, custody may be modified when there is a combination of adverse circumstances. Bell on Mississippi Family Law § 5.11(5)(a) (2005);
 
 see also Brown v. White,
 
 875 So.2d 1116, 1119(¶ 9) (Miss.Ct.App.2004) (adverse material changes included the custodial parent’s moving frequently, mother’s relationships with different men, the child’s failing first grade after having attended numerous schools, and the custodial parent’s job schedule interfering with the child’s care);
 
 Fletcher v. Shaw,
 
 800 So.2d 1212, 1217(¶ 13) (Miss.Ct.App.2001) (custody modified under the traditional test because of material adverse changes of the custodial parent’s frequent moving, unemployment, leaving the child with friends for long periods of time, and having two children out of wedlock).
 

 ¶ 33. In the instant case, the chancellor found a material change in circumstances adverse to the child based on the following facts. While modification cannot be based on relocation alone, Phyllis had relocated several times. Additionally, Phyllis relies on others for support, including her parents and brother, and she was, at the time of the hearing, relying on welfare in the form of food stamps for herself and her other son. The chancellor also noted Phyllis had a suspended driver’s license since 2001, and it was only cured after the hearing in June 2007.
 

 ¶ 34. The chancellor also acknowledged the parents’ living conditions at the time of the hearing: Phyllis resided in a two-bedroom, one-bathroom mobile home with her living in one bedroom, and Jacob and Clay living in the other; while John resided alone in his own three-bedroom home in Petal, where Clay had resided since approximately six months after John received temporary custody of Clay in January 2006. As far as employment, the chancellor found both parents were currently gainfully employed: Phyllis had worked at the same daycare for over two years, although she still relied on food stamps; and John had been self-employed as a painting contractor for three years. Finally, the chancellor noted that Clay had been enrolled in Petal Elementary since under John’s custody in January 2006, was doing well academically, and participated in many extracurricular activities, including soccer and karate. John promised to obtain more aggressive therapy for Clay’s speech problems and enroll him in a specialized speech-therapy program.
 

 ¶ 35. The chancellor also took into account Dr. Galloway’s opinion, which concluded that Clay would be better off remaining in John’s custody. Notably, the chancellor cited Dr. Galloway’s comments that: Phyllis was insufficiently self-reliant to provide proper care for Clay; he observed her blaming others for the difficulties in her life; and she had an inability to make plans for the future. Further, Clay and John were bonding well as father and son.
 

 ¶ 36. While this case does not show the severe adverse material changes in circumstances found in some child custody modification cases, we find the chancellor’s determinations were proper. We are mindful of our standard of review: “[o]n
 
 *850
 
 appeal, we are limited to searching for an abuse of that discretion; otherwise, our duty is to affirm the chancellor.”
 
 Carter v. Carter,
 
 735 So.2d 1109, 1114(1118) (Miss.Ct.App.1999) (citing
 
 Murphy v. Murphy,
 
 631 So.2d 812, 815 (Miss.1994)). We cannot reweigh the evidence, but if we find substantial evidence to support the chancellor’s findings, we must affirm.
 
 Id.
 
 Further, any resolution of factual disputes is always a matter entrusted to the sound discretion of the chancellor.
 
 Id.
 
 at (¶ 19) (citing
 
 Murphy,
 
 631 So.2d at 815). Because he was present in the courtroom, the chancellor was best equipped to listen to the witnesses, observe their demeanor, and determine their credibility.
 
 Id.
 

 ¶ 37. In examining the record, we note of particular significance Clay’s academic struggles while in the custody of his mother, which improved once custody was transferred to John. Although the chancellor did not make an on-the-record determination of whose fault the thirty-five absences from kindergarten were related to, Clay was in the custody of Phyllis when this occurred, and there was conflicting evidence of blame. Additionally, school records show Clay was not ready for kindergarten, regardless of the reason, as Clay performed very poorly on his “reading readiness” test. While there was no baseline of comparison for Clay’s academic ability, as he was not in school prior to the initial award of custody, his academic improvement once in the custody of his father is noteworthy. Additionally, we note Phyllis’s numerous moves caused Clay to attend two different schools in the fall of 2005 before John was granted temporary custody.
 
 [4]
 
 Considering the totality of the circumstances, we cannot say the chancellor erred in finding a material change in circumstances adverse to the child’s best interest.
 

 2. Application of the Albright Factors
 

 ¶ 38. After finding a material change in circumstances adverse to the child, the chancellor made a thorough analysis of the factors found in
 
 Albright
 
 in order to determine whether a change in custody was in the best interest of the child.
 
 See Albright,
 
 437 So.2d at 1005. The chancellor found that Clay’s age, health and sex; the parents’ employments, parenting skills, physical and mental health, age, and moral fitness; and the emotional ties between the parents and the child were all neutral. Therefore, these factors did not weigh in favor of either John or Phyllis.
 

 ¶ 39. The chancellor found the remaining
 
 Albright
 
 factors all weighed in favor of John. Regarding continuity of care, during the time Phyllis had primary physical custody of Clay since the divorce, John had significant visitation. The chancellor noted John’s documentation that he had Clay a total of 501 days from 2001, the first year of divorce, until 2003, when Clay entered kindergarten. Clay has been in the tem
 
 *851
 
 porary custody of his father since January 2006, or over two years as of the entry of the chancellor’s judgment on modification. Although the chancellor acknowledged that both parents expressed a willingness to care for Clay, John was deemed more capable of providing that care, as Phyllis relied on family and friends and was, at the time of the hearing, on food stamps. Also, the chancellor noted that John had been self-employed for three years and now owns a home. Clay’s home, school, and community record weighed in favor of John; since living with John, Clay was doing well in school and was involved in many extracurricular activities. The chancellor was primarily concerned with the stability issues in Phyllis’s life. He stated that while Phyllis had “made an effort to stabilize her life, and home environment, this seems to have been a long, drawn out process.” During the time she had primary custody of Clay, Phyllis moved to five different residences in four different towns; further, she had been “constantly living with and utilizing the assistance of relatives.” The chancellor noted John had only resided in and around Hattiesburg since the divorce, except for a brief period of time he worked in Louisiana; the chancellor found that John provided a regular, highly structured schedule for Clay while in his custody. The chancellor concluded that it was in Clay’s best interest for permanent physical care and custody to be awarded to John.
 

 ¶ 40. We acknowledge that the chancellor had a difficult decision to make, as the evidence showed both parents appear to be “good” parents and have a strong bond with Clay. However, the chancellor’s findings were supported by substantial evidence and based on the best interest of the child. Accordingly, we cannot conclude that the chancellor erred in modifying custody.
 

 3. Dr. Galloway’s Testimony
 

 ¶ 41. Phyllis argues that the chancellor ei’red in admitting the expert testimony of Dr. Galloway at the modification hearing. She notes his observations that she was an unfit parent were made after a single thirty-minute visit; Dr. Galloway did not visit her home or interview her friends, relatives, or employers. She further criticizes him for allegedly basing his opinion on the fact she receives food stamps. Finally, Phyllis contends that Dr. Galloway’s testimony was not reliable, as John had employed him in January 2005, and had paid him “a considerable amount of money.”
 

 ¶ 42. The standard of review for the admission or exclusion of evidence is an abuse of discretion.
 
 Miss. Transp. Comm’n v. McLemore,
 
 863 So.2d 31, 34(¶ 4) (Miss.2003) (citing
 
 Haggerty v. Foster,
 
 838 So.2d 948, 958(¶25) (Miss.2002)). Further, the admission of expert testimony is within the sound discretion of the trial judge; therefore, the trial judge’s decision will stand “unless we conclude that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion.”
 
 Id.
 
 (quoting
 
 Puckett v. State,
 
 737 So.2d 322, 342(¶ 57) (Miss.1999)).
 

 ¶ 43. Rule 702 of the Mississippi Rules of Evidence governs the admissibility of expert testimony. It provides:
 

 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the wit
 
 *852
 
 ness has applied the principles and methods reliably to the facts of the case.
 

 M.R.E. 702. The trial court must first determine if the expert’s testimony is relevant; that is, does the testimony assist the trier of fact.
 
 McLemore,
 
 863 So.2d at 38(¶ 16) (citing
 
 Mathis v. Exxon Corp.,
 
 302 F.3d 448, 460 (5th Cir.2002)). Then, the trial court must determine if the proffered testimony is reliable.
 
 Giannaris,
 
 960 So.2d at 470(¶ 14) (citing
 
 Pipitone v. Biomatrix, Inc.,
 
 288 F.3d 239, 244 (5th Cir.2002)). “[T]he trial court has ‘considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.’ ”
 
 McLemore,
 
 863 So.2d at 37(¶ 13) (quoting
 
 Kumho Tire Co. v. Carmichael,
 
 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). Factors the trial court may consider pertaining to reliability include:
 

 whether the theory or technique can be and has been tested; whether it has been subjected to peer review and publication; whether, in respect to a particular' technique, there is a high known or potential rate of error; whether there are standards controlling the techniques of operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community.
 

 Id.
 
 (citing
 
 Daubert v. Merrell Dow Pharmaceuticals, Inc.,
 
 509 U.S. 579, 592-94, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).
 

 ¶ 44. First, we note John did not address this issue in his brief.
 
 [5]
 
 Regardless, we find Phyllis’s contentions are without merit. John tendered Dr. Galloway as an expert in counseling, sociology, and social work. After voir-dire examination, Phyllis’s objection to Dr. Galloway’s admission as an expert was overruled. In voir dire, Dr. Galloway testified that he was a professional counselor and social worker. He holds licenses in Louisiana in marriage and family counseling and vocational rehabilitation and counseling. He admitted he was not a licensed professional counselor as he did not think it was necessary because of the licenses he already holds. He has bachelors’ degrees in psychology and sociology, a master’s degree in social work, and a Ph.D. in sociology. His past work includes private practice in psychiatric settings (both inpatient and outpatient), teaching, and more recently doing custody and mediation work in the court system. Having been accepted as an expert in Mississippi and Louisiana, he stated that he had testified at forty cases in one year. He testified that no court had ever rejected him as an expert. He stated that the methods he utilized were appropriate to the information he was provided by the court. He utilized interviewing techniques and behavioral diagnostic procedures to come to an opinion. Dr. Galloway had also recently attended three seminars with specific training in custody evaluations.
 

 ¶ 45. We find Dr. Galloway’s testimony was both relevant and reliable. A qualified third-party’s evaluation of the situation is useful to the fact-finder. Custody evaluation experts are often called to testify in modification matters, and Phyllis hired her own expert, Levin, for the same purpose. Dr. Galloway’s credentials show he has the skill, experience, and education to assist the trier of fact in this determination. The interviews were an appropriate, reliable method of gathering this information, and the chancellor was aware of Dr. Galloway’s limited time with Phyllis, which was in part due to Phyllis’s transience.
 

 ¶ 46. Dr. Galloway made his custody recommendation in October 2005 after having met with John twice and Phyllis
 
 *853
 
 once. All of these visits were in his office. Dr. Galloway explained in his October 2005 letter that he attempted to visit Phyllis at home, but she was temporarily moving to Baton Rouge at the time. By the June 2007 hearing, where Dr. Galloway opined she was “unfit,” Dr. Galloway had met with John three more times. Clay was present for three of the meetings. Dr. Galloway made no mention of Phyllis being on food stamps in his written report, and he expressly denied blaming her “unfitness” solely on receiving this assistance. Moreover, while the chancellor considered Dr. Galloway’s opinion, there is no indication that the chancellor agreed with his determination that Phyllis was an “unfit” parent. However, the chancellor did agree with Dr. Galloway’s determination that Phyllis was too reliant on others for support and lacked stability.
 

 ¶ 47. Additionally, we find no merit to Phyllis’s contention that Dr. Galloway was biased toward John because he was hired by John individually before the court appointed him. From the record, it is unclear if Dr. Galloway met with John in January 2005 or January 2006. The court appointed Dr. Galloway on August 15, 2005. John maintains he did not hire Dr. Galloway independently. Dr. Galloway testified his notes were unclear on the matter. It was undisputed that Dr. Galloway was paid by John pursuant to the court order, as Phyllis had limited funds. At the June 2007 hearing, the chancellor found that he had observed Dr. Galloway as an expert witness for several years and found him always to have the best interest of the child in mind, and he was never biased toward a specific parent. Further, Phyllis had not filed a motion in limine to exclude Dr. Galloway’s testimony before trial; the first time she raised the issue was at the hearing. Accordingly, we find the chancellor did not abuse his discretion in admitting Dr. Galloway’s testimony regarding Clay’s custody.
 

 CONCLUSION
 

 ¶ 48. We find that the chancellor applied the correct legal standard, and his decision to modify custody from Phyllis to John is based upon substantial, credible evidence. Accordingly, we affirm.
 

 ¶ 49. THE JUDGMENT OF THE CHANCERY COURT OF LAMAR COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR. GRIFFIS, J., CONCURS IN PART AND IN THE RESULT. CARLTON, J., CONCURS IN RESULT ONLY.
 

 [1]
 

 . John's drug tests were negative. Phyllis’s urinalysis drug test came back negative. She submitted to a hair follicle drug test in November 2005, but due to an error by the testing company, the lab would not release the results.
 

 [2]
 

 . John had Clay for 149 days in 2001; 196 days in 2002; and 156 days in 2003, for a total of 501 days.
 

 [3]
 

 . In
 
 Carter v. Carter,
 
 735 So.2d 1109 (Miss.Ct.App.1999), this Court affirmed the application of the
 
 Riley
 
 test over the traditional test for custody modification. In
 
 Carter,
 
 there was no material change in circumstance because the stay-at-home mother's neglect of her two children had been continual since the original custody decree.
 
 Id.
 
 at 1113(1111). In
 
 Hoggall v. Hoggatt,
 
 796 So.2d 273 (Miss.Ct.App.2001), it was unclear whether the chancellor based his decision on
 
 Riley
 
 or the traditional test, but this Court upheld the modification while questioning whether there was indeed a material change in circumstances. As in
 
 Carter,
 
 evidence in
 
 Hoggatt
 
 showed a pattern of neglect by the mother, and the chancellor found that the child’s current situation with his mother was detrimental to his physical and emotional health, while the father had improved his living situation since the time of the original decree.
 
 Id.
 
 at 275(117). This Court stated it favored a narrow application of
 
 Riley,
 
 where the existing custody arrangement is detrimental to the child and the noncustodial parent demonstrates a living environment that is beneficial to the child and which was not present at the time of the original custody determination.
 
 Id.
 
 at (¶ 9).
 

 [4]
 

 . We note several cases that found academic struggles, in the totality of the circumstances, to be a material change in circumstances adverse to the child's best interest.
 
 See Powell v. Powell,
 
 976 So.2d 358, 362(11 17) (Miss.Ct.App.2008) (denial of custody modification reversed for reconsideration of whether there was a material change in circumstances where one minor child was two years behind in school, other child had speech impediment, and evidence was present of their difficulties adjusting to constant change in their edu-calional environments);
 
 Brown,
 
 875 So.2d at 1119(¶9) (modification based on a material change in circumstances adversely affecting the child, including child doing poorly academically and failing the first grade);
 
 Cooper v. Ingram,
 
 814 So.2d 166, 168(113) (Miss.Ct.App.2002) (custody modification upheld based on chancellor’s finding that for a child with learning disability, the child’s academic struggles without timely intervention by tire custodial parent constituted an adverse material change in circumstances).
 

 [5]
 

 . However, we note that Phyllis did not include this issue in her "statement of the issues” section of her brief, but only in her argument section.