# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-00679-COA

JOHN COOPER DIXON                                                        APPELLANT

v.

CANDICE DIXON                                                               APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 03/28/2022 |
| TRIAL JUDGE: | HON. DOROTHY WINSTON COLOM |
| COURT FROM WHICH APPEALED: | ATTALA COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | JEFFREY J. HOSFORD |
| ATTORNEY FOR APPELLEE: | STEVEN D. SETTLEMIRES |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 04/09/2024 |
| MOTION FOR REHEARING FILED: | |

## BEFORE BARNES, C.J., GREENLEE AND McCARTY, JJ.

## BARNES, C.J., FOR THE COURT:

¶1. John Cooper Dixon (Cooper) appeals from the judgment of the Attala County Chancery Court awarding legal and physical custody of the couple's two minor children to Candice Dixon. Cooper argues that the chancery court erred in its findings on three *Albright*[1] factors: the emotional ties of the parents and children favoring Candice; the parenting skills and willingness and capacity to provide primary child care favoring both parents; and the weight of the moral fitness factor favoring Cooper. We find that the chancery court did not abuse its discretion regarding these *Albright* factors and, accordingly, affirm the judgment.

---

[1] *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983).

**FACTS AND PROCEDURAL HISTORY**

¶2.    Candice and Cooper were married in April 2012 and separated in September 2019 in Kosciusko, Mississippi. Two children were born of the marriage, a daughter and a son. At the time of trial, the children were in the third grade and pre-kindergarten, respectively, while Candice was thirty-nine years old, and Cooper was forty-one.

¶3.    Candice has been employed full-time as a teacher at Kosciusko Lower Elementary School for the entire marriage. She testified she is in good health but takes medication daily for anxiety. At the time of the separation, Candice moved into her mother's home in Kosciusko, where she remained through trial. The home is five miles from the marital home and has three bedrooms. The children share a bedroom at the home of Candice's mother.

¶4.    At the time of trial, Cooper was self-employed as a consultant and operated his business from home, with occasional out-of-town travel. Before the couple married, he served in the United States Marine Corps for six years and was deployed to Iraq for one year. He takes daily medication and receives regular therapy for PTSD. He resides in the marital home in Kosciusko, which the couple purchased in 2013. The home has three bedrooms and a pool.

¶5.    During the separation, the children resided with Candice four nights per week and with Cooper three nights per week. Before separation, Candice was the children's primary caregiver, but Cooper often participated in the children's activities. Numerous friends and family members deemed them to be good parents. The chancellor found it apparent that both parties loved their children, and other credible witnesses at trial corroborated this fact.

¶6. In January 2020, Candice filed for divorce on the ground of habitual cruel and inhuman treatment or, in the alternative, irreconcilable differences. Cooper filed an answer and counterclaim for divorce on the grounds of habitual use of opium, morphine, or other like drugs;[2] adultery; and habitual cruel and inhuman treatment or, in the alternative, irreconcilable differences. Each party sought support and custody of the children. The day before trial commenced, the parties consented to a divorce on the ground of irreconcilable differences, with the remaining contested issues to be determined at trial.

¶7. A two-day trial occurred in January 2022 to determine child custody, child support, visitation, and equitable distribution of the marital property. The chancery court awarded Candice legal and physical custody and ordered Cooper to pay $563.00 per month in child support. Cooper filed a motion to alter or amend the judgment, which the court denied.

¶8. In its opinion and final judgment, the chancery court found Cooper's "controlling nature and temper caused problems in the [seven-year] marriage."[3] Cooper believed his mother-in-law controlled Candice, which caused strife when his mother-in-law visited the

---

[2] Cooper alleged that Candice abused prescription medications, including her students' medication—a claim Candice denied. When Cooper found a student's bottle of medication under the seat of Candice's vehicle, he referred to it as "a game changer" and a "smoking gun." Candice testified that she administered a student's medication at lunch and thus kept it in her lunch box. While she admitted that taking the student's medication off school property was against school policy, she explained that she may have inadvertently taken it off school property in her lunch box. Regardless, the chancellor did not mention the allegation in her final judgment except to write that Cooper and his father "testified regarding incidents involving [Candice] and the children[, but] this Court did not find that testimony credible."

[3] These findings were related to an equitable distribution factor, but we find them noteworthy to describe the parties' marital strife.

marital home. After separation, Candice admitted to having a sexual relationship with a former teacher, which also caused conflict. The chancellor found Cooper was unable to interact civilly with Candice.

**Albright *Factors***

¶9. "[T]he polestar consideration in child custody cases is the best interest and welfare of the child." *Albright*, 437 So. 2d at 1005. In determining the child's best interest, the chancellor should consider the following factors:

> (1) the child's age, health, and sex; (2) the parent with the continuity of care prior to the separation; (3) the parent with the best parenting skills and the willingness and capacity to provide primary child care; (4) the parents' employment and the responsibilities of that employment; (5) the parents' physical and mental health and age; (6) the emotional ties of the parent and child; (7) the parents' moral fitness; (8) the child's home, school, and community record; (9) the child's preference at the age sufficient to express a preference by law; (10) the stability of the parents' home environments and employment; and (11) other factors relevant to the parent-child relationship.

*Roberts v. Eads*, 235 So. 3d 1425, 1428 (¶12) (Miss. Ct. App. 2017) (citing *Albright*, 437 So. 2d at 1005).

¶10. The chancellor found three of the eleven *Albright* factors favored neither parent: age, health, and sex of the children, physical and emotional fitness and age of the parents, and preference of the children. As far as fitness, the chancellor found both parents were in good health but noted that both took daily medication (Cooper for PTSD and Candice for anxiety). Neither child was old enough to express a custody preference.

¶11. Two *Albright* factors favored both parents: parenting skills and willingness and capacity to provide primary care, as well as the home, school, and community record of the

4

children.  The chancellor found both children were thriving in their respective schools and participating in many extra-curricular activities that both parents attended.

¶12.    The chancellor found four factors favored Candice: continuity of care prior to separation, employment of the parents and responsibilities, emotional ties of parents and children, and stability of the home environment.  Candice was the children's primary caregiver before separation.  Both parties worked full-time jobs, but Cooper's job required him to be out of town occasionally, and he played in a band as a hobby infrequently on the weekends.  Regarding employment, during the marriage Cooper had changed jobs several times (law enforcement officer, school resource officer, and school safety specialist[4]), and while he was then self-employed and able to set his own hours, he still occasionally worked out of town.  Candice was a full-time teacher in the same school system where her children attended and was more available to them during the day.  The testimony showed that both parents had strong emotional ties with their children; however, Candice was the parent the school would contact when her daughter was upset.  The daughter also would go to Candice's classroom daily to visit her.

¶13.    Regarding the stability of the home environment, the chancellor found both parties had "appropriate homes" for the children.  Candice testified that she intended to purchase her mother's home where she and the children resided.  Candice has extended family in Kosciusko, where the children have numerous friends.  Cooper, however, testified that he

---

[4]  Cooper voluntarily resigned from his last job with the school district after being charged with driving under the influence (DUI).  The charges were dropped, but the record indicates Cooper received a separate ticket for DUI shortly after the trial in this matter.

had no friends in Kosciusko and intended to move from the town. The chancellor was also "concerned" with Cooper's "inability to control his anger"[5] and encouraged him to continue his therapy and medication. The chancellor noted that even though Cooper had never physically attacked or harmed anyone in front of the children, he had cursed and demeaned Candice in front of them.

¶14. The only factor favoring Cooper was moral fitness because Candice began a sexual relationship with a former colleague after the separation but before the divorce. Regarding other relevant factors, although Cooper and his father testified about several incidents involving Candice and the children, the chancellor did not find the testimony credible. She did not elaborate on what the incidents were.

### *Trial Testimony*

¶15. On appeal, both parties point to trial testimony from the numerous witnesses to bolster their respective custody arguments. Candice testified that Cooper continued to demean her via text messages and had "obvious anger and hatred towards [her,]" making

---

[5] Testimony showed that during the marriage, the animosity between Cooper and Candice's mother, Caye Adams, escalated into a physical altercation about four years prior to trial. Caye testified that during a heated argument, Cooper grabbed her by the throat. Caye fell on the couch, and Cooper straddled her and began choking her. Cooper, however, testified that Caye "initiated everything," hitting him hard. He denied choking her, but testified that he blacked out from her punch and woke up with his hands around her neck. Caye called law enforcement, who ordered her to leave. Cooper claimed he was reacting in self-preservation due to his training. Cooper's father testified "it's a thousand wonders" his son had not killed Caye, as he is a "trained killer" as a Marine. After the fight, Caye claimed she was no longer welcome in the couple's home but would still visit occasionally.

communication difficult. Cooper frequently called her names such as "racist,"[6] a "pill-popper," a "racist pill-head," a "whore," and a "liar," as shown by testimony and texts admitted into evidence. Cooper also called Candice names in front of the children and other individuals. At trial, Cooper admitted referring to his mother-in-law as Candice's "whore mother." He also admitted to threatening Candice by stating that she would "never teach again once he is done with her," and she is "facing jail time" due to alleged possession of a controlled substance.

¶16. Several witnesses for both parties testified as to the fitness of both parents. Candice was described as gentle and loving to the children, putting them first in her life. Candice even testified that Cooper was a good father. As a teacher, Candice's supervisor, who was the principal at her school, testified that she had had "zero complaints" from parents about Candice, no concerns about Candice's job performance, and no concerns about Candice's raising her own children. She described Candice as very quiet, kind, and loving to her students. Candice also had an excellent teaching-attendance record.

¶17. Other facts will be developed as needed during the discussion of the issues.

## STANDARD OF REVIEW

¶18. "The standard of review in child custody cases is limited." *Barber v. Barber*, 288 So.

---

[6] Cooper repeatedly accused Candice of being a racist due to a specific text message between fellow-teachers regarding "the black team" at her school. Candice's principal testified at length, however, that the text was not "racist" but referencing a national program the school had implemented to build student self-esteem and camaraderie. The elementary students had been divided into different colored houses, or teams, and vied for points based on good behaviors. Candice denied being a racist and testified Cooper had taken the text out of context.

3d 325, 330 (¶22) (Miss. 2020) (quoting *Floyd v. Floyd*, 949 So. 2d 26, 28 (¶5) (Miss. 2007)). The appellate court will "affirm findings of fact by chancellors in child custody cases when they are supported by substantial evidence unless the chancellor abused [his or her] discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." *Id.* (quoting *Borden v. Borden*, 167 So. 3d 238, 241 (¶4) (Miss. 2014)). "Further, any resolution of factual disputes is always a matter entrusted to the sound discretion of the chancellor." *Minter v. Minter*, 29 So. 3d 840, 850 (¶36) (Miss. Ct. App. 2009) (citing *Carter v. Carter*, 735 So. 2d 1109, 1114 (¶18) (Miss. Ct. App. 1999)).

**ANALYSIS**

¶19. Cooper's sole issue on appeal is whether the chancellor abused her discretion in three *Albright*-factor findings. He argues that re-weighing these factors would give him custody of the children. We shall discuss each factor in turn.

**I. Emotional Ties of Parent and Child**

¶20. Cooper argues that the chancellor erred in finding this factor favored Candice, or it should have favored both parents. Even though the chancellor found both parties had strong emotional ties with their children, she found this factor favored Candice because the daughter would come to Candice's classroom daily to see her, and the school would contact Candice when the daughter was upset. Cooper claims these facts should not be considered because any child would go see the parent with whom they shared the same school building. Cooper also argues the school contacted Candice when the daughter was upset merely because she was an employee of the school district. Additionally, Cooper contends that the

8

chancellor discounted how Cooper taught the children various life tasks, that he "[took] their health seriously" and coached them in team sports.

¶21. We are not persuaded by Cooper's arguments. The record indicated Candice and her children have a strong bond. Candice testified that her daughter was a "mama's girl" and "did not like being away" from Candice. After the separation, when the daughter would be staying with Cooper, several times Candice had to drive to the nearby middle school because the daughter was upset and missed her mother. On school days, every morning Candice would pick the children up at Cooper's residence and take them to school, as well as drop the children off after school at Cooper's house. The teacher of Candice's son testified that Candice dropped him off in the morning, made sure he was in his classroom, and gave him a goodbye kiss before going to her classroom. Another teacher corroborated that the daughter came to Candice's classroom after school a couple of times a week.

¶22. In child custody matters, "[t]he chancellor has the sole responsibility to determine the credibility of witnesses and evidence, and the weight to be given each." *Lee v. Lee*, 798 So. 2d 1284, 1288 (¶14) (Miss. 2001) (citing *Chamblee v. Chamblee*, 637 So. 2d 850, 860 (Miss. 1994)). While the chancellor acknowledged that Cooper also had a strong tie with his children, substantial evidence supported the chancellor's finding that this factor favored Candice.

## II. Parenting Skills and Willingness/Capacity to Provide Primary Child Care

¶23. The chancellor found this factor favored both parents but did not make any specific findings. Cooper claims this factor should have favored him because of three reasons: the

daughter's tooth decay, the children's head lice infestation, and the son's swimming instruction.

¶24. Cooper argues that Candice ignored a dentist's orders to limit sugary drinks when their daughter began having tooth-decay problems at approximately three years old. However, on cross-examination, Cooper admitted the dentist recommended no sugary drinks "except at mealtimes." Candice also admitted having "a hard time" with this recommendation because her daughter loved juice. Cooper also accused Candice of forgetting to brush the children's teeth when in her care—a claim Candice denies.

¶25. Additionally, Cooper argues that Candice did not properly treat the children for a head lice infestation or take it "seriously." He complained that instead of taking the children to the doctor, Candice used over-the-counter medication. He claimed that the infestation lasted over a month and only ended when he took them to the doctor. Also, Cooper contends that Candice violated school policy by not notifying the school about the children's infestation and not providing the school with proof of treatment. Candice testified that the infestation lasted only a week and a half, and she immediately treated them with store-bought kits, pulled the nits out by hand, and treated them with an at-home kit a second time. When the kits did not work, Candice made an appointment for a professional treatment, but Cooper took the children to the appointment before she could apply the treatment. Candice testified that she was aware of the school policy on lice and treated the children the same day she discovered the infestation.

¶26. Finally, Cooper alleges that he was concerned about his son's safety when Candice

made "little effort" to teach their son how to swim, even though the marital home had a pool in the backyard. At trial, Candice responded that at the time her son could start learning to swim, the couple was separated, and Cooper alone resided in the marital home with access to the pool. Candice attempted to teach the child to swim "a bit" at the country club pool, which was difficult because it was busy.

¶27. We are not persuaded by Cooper's arguments that this factor should only favor him; the evidence supports favoring both parents. With the exception of Cooper and his father, numerous witnesses testified that Candice is an attentive mother who takes good care of her children. Evidence also showed Cooper has good parenting skills, as well as willingness and capacity to provide care for his children. Both parents participated in their children's doctor's appointments. We find the chancellor did not abuse her discretion in finding this factor favored both parents.

### III. Moral Fitness

¶28. Although the chancellor found the moral fitness factor favored Cooper, he argues it should have been given more weight. In support, he claims Candice is guilty of the following incidents: she "committed adultery," "got drunk to the point of accidentally flashing [at] a charity ball," "acted inappropriate[ly] in front of Cooper's father while in the children's bedroom," "texted coworkers about how hungover she was while on the clock," "skinny dipped in a hot tub with her mother," and "bathed with the children."[7] The chancellor, in finding this factor favored Cooper, only cited Candice's (admitted) sexual

---

[7] Cooper did not include in his argument his allegations that Candice abused prescription medications or took her students' medication.

relationship with her former colleague, which began six months after the parties separated.

¶29. An *Albright* analysis is not "the equivalent of a mathematical formula" or "an exact science." *Lee*, 798 So. 2d at 1288 (¶15). While the "factors are not meant to be weighed equally in every case, . . . the chancellor has the ultimate discretion to weigh the evidence the way [s]he sees fit." *Hall v. Hall*, 134 So. 3d 822, 827 (¶19) (Miss. Ct. App. 2014) (citations omitted) (quoting *Johnson v. Gray*, 859 So. 2d 1006, 1013-14 (¶46) (Miss. 2003)).

¶30. Candice denied having a sexual relationship with her ex-colleague before separating from Cooper but admitted it was before their divorce. "Adultery of a parent may be an unwholesome influence and an impairment to the child's best interest, but on the other hand, may have no effect. The trial court should consider this factor along with all others when making original custody determinations." *Brock v. Brock*, 906 So. 2d 879, 886 (¶38) (Miss. Ct. App. 2005) (quoting *Brekeen v. Brekeen*, 880 So. 2d 280, 284 (¶6) (Miss. 2004)). In *Brock*, the appellant unsuccessfully argued against child custody being awarded "to a woman who engaged in an affair." *Id.* Even though the chancellor found the moral fitness factor favored him, the mother's adulterous relationship was found not to intrude on her role as a parent. *Id.* at 885-86 (¶36). In affirming this finding, our Court found, "The evidence showed that [the mother] never talked about her affair in front of the children, never engaged in adulterous activity when her children were present, and never allowed the children to meet her lover." *Id.* at 886 (¶38). Similarly, here, no one testified that the relationship had any effect on the parties' children, that Candice left the children to spend time with her former colleague, or that the relationship otherwise impacted her parenting

ability.

¶31. Testimony showed the charity-ball incident about which Cooper complains occurred seven years before trial. Candice, intoxicated, fell off a chair and accidentally flashed her "lady parts" to others in the room. Candice testified that they had laughed about it the next day. The testimony showed no children were present, and it was an isolated event. We cannot say this incident indicates Candice is morally unfit as a parent.

¶32. Cooper and his father both testified about an alleged incident where they claim Candice became drunk one afternoon and propositioned Cooper's father in the children's bedroom—a claim Candice vehemently denies. She testified the alleged incident was a "blatant lie," was "not [her] personality," and "baffled" her. Further, at trial, the chancellor sustained Candice's objection as to speculation by Cooper's father when he recounted the event. This allegation also conflicts with other testimony from numerous witnesses showing Candice's good character and reserved demeanor. Resolution of factual disputes resides with the chancellor. *Minter*, 29 So. 3d at 850 (¶36). Apparently, the chancellor did not find the testimony about this alleged incident credible, as it was not mentioned in her final judgment.

¶33. Cooper also claims Candice is a morally unfit parent because she joked with coworkers via text messages about being hungover one day at school. At trial, Cooper pointed to Candice's wine consumption and the fact she "has gotten intoxicated in the past." He testified that she drank wine on the weekends, in front of the children, at home, and at the country club pool. Likewise, however, Cooper's father testified that he had seen Cooper

13

consume alcohol in the presence of the children at home. Cooper admitted to drinking at home in front of the children and even while on medication for PTSD. Further, there is no proof Candice has been arrested for DUI; Cooper resigned from a job, however, due to a DUI charge and was arrested for DUI after trial. Again, we cannot say the chancellor erred in not condemning Candice's drinking any more than Cooper's drinking.

¶34. Finally, Cooper argues that Candice is morally unfit because she has admittedly "skinny dipped" with her mother in a hot tub and bathed with the children in the bathtub. However, there was no testimony the children were present in the hot tub. Further, Candice testified she occasionally bathed with her daughter when she was one-to-five years old and with her son when he was two-to-three years old. There was no indication this behavior was morally aberrant. The chancellor has the ultimate discretion to weigh the evidence. *Lee*, 798 So. 2d at 1288 (¶14). We cannot say she erred in not assigning more weight on the moral fitness factor.

## CONCLUSION

¶35. The chancellor's *Albright* findings were supported by substantial evidence from the record. We find no error in the chancellor's judgment awarding legal and physical custody of the two children to Candice. Accordingly, we affirm the chancellor's judgment.

¶36. **AFFIRMED.**

**CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**