735 So.2d 1109 (1999)
Wendee Gail Wortman CARTER, Appellant,
v.
Billy Michael CARTER, Appellee.
No. 97-CA-00115 COA.
Court of Appeals of Mississippi.
March 23, 1999.
*1111 Tracy L. Morris, Gulfport, Attorney for Appellant.
James D. Bell, Madison, Eduardo Alberto Flechas, Jackson, Attorneys for Appellee.
EN BANC.

MODIFIED OPINION ON MOTION FOR REHEARING
DIAZ, J., for the Court:
¶ 1. The original opinion is withdrawn and the following is substituted. The motion for rehearing is granted.
¶ 2. This case is before the Court on an appeal by Wendee Carter. She seeks to reverse two rulings issued in the Chancery Court of Madison County. The first ruling denied her petition for contempt brought against her former husband, Billy Carter, for failure to pay child support. The second ruling amended the original judgment of divorce to change custody of the two minor children of the parties from Mrs. Carter to Mr. Carter. Finding no cause to reverse the chancellor's modification of custody order, we affirm on that issue. However, it is this Court's opinion that the chancellor erred in denying Mrs. Carter's petition for contempt. Accordingly, we reverse and remand on that issue alone for proceedings consistent with this opinion.

FACTS
¶ 3. On October 19, 1994, Wendee and Billy Carter were divorced, and an order was entered giving Mrs. Carter physical and legal custody of the two minor children of the marriage. Mr. Carter was ordered to pay twenty percent of his adjusted gross income in child support. On April 4, 1996, Mr. Carter filed a motion to modify the final judgment of custody and support, citing a material change in circumstances adverse to the best interests and welfare of the children. Thereafter, on April 12, 1996, Mrs. Carter filed a motion seeking to hold Mr. Carter in contempt for failing to pay child support on income he received from his newspaper delivery route. The chancery court denied Mrs. Carter's motion for contempt but granted Mr. Carter's motion for modification, awarding primary physical and legal custody of the two children to Mr. Carter. *1112 It is from these two orders that Mrs. Carter now brings forth her appeal to this Court.

DISCUSSION

I. DOES THIS COURT HAVE JURISDICTION TO CONSIDER THE CHANCELLOR'S ORDER DENYING MRS. CARTER'S PETITION FOR CONTEMPT?
¶ 4. Mr. Carter raises the issue of whether this Court has jurisdiction to consider the chancellor's ruling on the contempt aspects. He claims that this issue was decided separately by the chancellor and there was not a timely notice of appeal from the order ruling on non-payment of child support.
¶ 5. Mr. Carter filed a motion seeking a modification of custody of the children on April 4, 1996. Mrs. Carter filed her motion for contempt for non-payment of child support on April 12. On April 19, she filed a separate written response to Mr. Carter's motion to change custody. The chancellor ruled on the contempt motion, denying relief, by order entered on August 30. The chancellor subsequently ruled on the custody modification by order entered on December 30. Mrs. Carter filed her notice of appeal on January 6, 1997.
¶ 6. It is axiomatic that only final orders are appealable. Grey v. Grey, 638 So.2d 488, 492 (Miss.1994). In the context of cases involving questions of family law, the issue of finality for purposes of appeal is somewhat unique since the chancery court retains jurisdiction of such matters as periodic alimony, child support, and child custody. It is possible that, over the course of an extended number of years, the court may be called upon to resolve any number of disputes, yet all of those disputes arise in the same proceeding. In some instances, there may arise legitimate questions of when a particular ruling is final for purposes of appeal. Under our current rules of procedure, it is envisioned that these recurring disputes, including contempt and custody modification proceedings, will be brought to the court's attention "by complaint or petition only...." M.R.C.P. 81 cmt. Though both parties in this case persist in calling their pleadings "motions," the comment specifically states that "[i]nitiating Rule 81(d) actions by `motion' is not intended." M.R.C.P. 81 cmt.
¶ 7. In order to determine the finality of the chancellor's ruling on the contempt matter, we must discover how these competing pleadings were treated procedurally. The chancellor correctly elected to treat the pleadings as what they actually represented, rather than to accept the incorrect nomenclature provided by the parties. Bruce v. Bruce, 587 So.2d 898, 904 (Miss.1991). It is obvious that Mr. Carter's pleading seeking modification of custody must be seen as either a complaint or petition under Rule 81. The question then arises as to whether to treat Mrs. Carter's subsequent motion for contempt as a counterclaim or as a separate Rule 81 complaint or petition commencing a separate proceeding. We observe that the chancellor elected to treat the contempt motion as a counterclaim even though Mrs. Carter did not identify it as one. In his order dealing with the contempt issue, the chancellor stated as follows:
Billy Michael Carter (Mike) filed a petition to modify custody. Wendee Gail Wortman Carter (Wendee) his former wife who has primary custody of their minor children answered and counterclaimed to cite Mike in contempt for failure to pay child support. (emphasis supplied).
¶ 8. We are of the opinion that the chancellor was acting within his discretion when he recast the pleadings in this manner. Because the chancellor elected to treat Mrs. Carter's separate pleading as a counterclaim, it is clear under our procedural rules that the order disposing of the counterclaim did not have the requisite finality to make it appealable. M.R.C.P. 54(b). Thus, until all aspects of the proceeding were resolved, there was no right *1113 to appeal. The final resolution of all issues then pending before the chancellor did not occur until December 30, 1996. Mrs. Carter filed her appeal notice within thirty days from that date. This vested jurisdiction in this Court to consider all matters ruled on by the chancellor, including specifically the issue of contempt.
¶ 9. By our holding, we do not mean to suggest that every post-divorce petition or complaint filed while some other claim advanced by the other party remains unresolved must be treated as a counterclaim. We only hold that the chancellor may, in the exercise of the discretion afforded to the trial courts to manage their own dockets, affirmatively elect to treat it as such. It may be that, in some circumstances, the first matter will have progressed so far toward final resolution that to permit the defending party to delay the finality of the court's decision by simply filing a new claim would be inequitable. In such case, the chancellor may, in the exercise of discretion, elect to treat this subsequent pleading as a separate proceeding. We only sound a note of caution that, in instances where there may be some question on the proper treatment of the second claim, the chancellor should speak on the record with some measure of certainty as how the competing pleadings are being handled procedurally. In the absence of a clear statement from the chancellor, counsel for the aggrieved litigant should be wary of relying on the result in this case as a basis to permit the appeal period to expire from an order that may, or may not, ultimately prove to be interlocutory in character.
¶ 10. Having determined that, in this instance, we have jurisdiction to reach the merits of both aspects of this appeal, we will now proceed to do so, touching first on the issue of child custody.

II. DID THE CHANCELLOR ERR IN MODIFYING THE ORIGINAL AWARD OF CUSTODY?
¶ 11. The chancellor modified the court's earlier award of custody, which gave Mrs. Carter primary custody of the two minor children. The two children of the marriage, a boy and a girl, were eight and six years of age, respectively, at the time of the modification hearing. There was a substantial amount of evidence presented regarding the care the children had received since the divorce that indicated that the children's physical needs were not being properly looked after. Teachers for both children reported the children repeatedly coming to school in an unclean and unkempt condition, sometimes to the extent that they had noticeable body odors. These teachers also reported repeated instances where the children did not appear to be appropriately dressed, to include lack of underwear or dressed too lightly to protect them from inclement weather. Mrs. Carter claimed that lack of sufficient resources caused her to have to wash clothing in the bathtub and that this explained why the children's clothing may not have always been clean.
¶ 12. There was evidence presented that tended to show that the children were not being subjected to appropriate discipline, and that this was causing the children to have behavioral problems at school. Mrs. Carter had subsequently remarried and there was evidence that her second husband was a photographer who engaged in photographing female nudes and that the children had, either purposely or through laxity in precautions, been exposed to photographic material having a sexual content inappropriate for younger children.
¶ 13. Mrs. Carter was unemployed and stayed at home as the caregiver for these two children as well as two younger children born to her subsequent marriage.
¶ 14. There was substantial evidence that the conditions of Mrs. Carter's home were below acceptable standards for basic cleanliness, and that the children had been subjected to five separate changes of residence in a space of approximately two years.
*1114 ¶ 15. The proof showed, on the other hand, that Mr. Carter lived in a home that he owned and that had recreational facilities available for the children. At least one expert in the area of family social work who had participated in evaluations of the children testified that there was an observable difference in the demeanor of the children depending on whether they were brought in by their father or mother. She said that the children were well-behaved and observed proper limits in their behavior when in the company of their father, but behaved inappropriately and were disruptive and unruly in the company of their mother.
¶ 16. There was, unquestionably, competing evidence presented to the chancellor that tended to contradict those matters set out above. Mrs. Carter claimed that many of the comments of the children made to investigating social workers had been programmed into them by Mr. Carter's mother and did not reflect the truth. There was even testimony from one investigating social worker who expressed the opinion that the daughter had been subjected to sexual abuse at the hands of Mr. Carter.
¶ 17. On this conflicting evidence, the chancellor rejected any conclusion that Mr. Carter had subjected his children to sexual abuse. He further found that the children were not receiving adequate physical care in terms of cleanliness and proper clothing while in their mother's care. He concluded that, on balance, the proof showed that the best interest of the children would be served by their being transferred to the primary care of their father.
¶ 18. The resolution of disputed questions of fact is a matter entrusted to the sound discretion of the chancellor. Murphy v. Murphy, 631 So.2d 812, 815 (Miss.1994). On appeal, we are limited to searching for an abuse of that discretion; otherwise, our duty is to affirm the chancellor. Id. Our job is not to reweigh the evidence to see if, confronted with the same conflicting evidence, we might decide the case differently. Rather, if we determine that there is substantial evidence in the record to support the findings of the chancellor, we ought properly to affirm.
¶ 19. The chancellor, by his presence in the courtroom, is best equipped to listen to the witnesses, observe their demeanor, and determine the credibility of the witnesses and what weight ought to be ascribed to the evidence given by those witnesses. Id. It is necessarily the case that, when conflicting testimony on the same issue is presented, the chancellor sitting as trier of fact must determine which version he finds more credible. Id.
¶ 20. As to matters of law, however, a different standard applies. In that case, our review is de novo, and if we determine that the chancellor applied an incorrect legal standard, we must reverse. Morreale v. Morreale, 646 So.2d 1264, 1267 (Miss.1994).
¶ 21. Both questions present themselves in this appeal. Mrs. Carter claims that the chancellor failed to apply the correct legal standard, citing authority that, in order to effect a change of custody, there must be a showing of a material change in circumstance in the situation of the custodial parent that is detrimental to the best interest of the children. Ash v. Ash, 622 So.2d 1264, 1265-66 (Miss.1993). Mrs. Carter claims that, instead of searching for a post-divorce detrimental change, the chancellor simply retried the issue of custody. In view of the chancellor's determination that the children's physical and emotional needs were not being properly met by the mother, her argument on this point amounts, in effect, to a claim that, so long as the neglect of the children has been continuous since the earlier grant of custody, the chancellor is without authority to intervene. We do not consider this to be the law. The Mississippi Supreme Court, in the 1996 case of Riley v. Doerner, in apparent recognition that such a technical application of the rule regarding *1115 change of custody could lead to nonsensical results, said:
In earlier opinions on this subject, we have held that a change in the circumstances of the non-custodial parent does not, by itself, merit a modification of custody. We adhere to that holding today. However, we further hold that when the environment provided by the custodial parent is found to be adverse to the child's best interest, and that the circumstances of the non-custodial parent have changed such that he or she is able to provide an environment more suitable than that of the custodial parent, the chancellor may modify custody accordingly.
Riley v. Doerner, 677 So.2d 740, 744 (Miss. 1996) (citations omitted).
¶ 22. The chancellor in this case included findings that the home situation of Mr. Carter had improved since the divorce in terms of its physical attributes as well as the stability of the home life to which the children would be exposed and the ability of Mr. Carter to provide the day-to-day care the children required.
¶ 23. There was substantial evidence, though hotly disputed, to support the chancellor's conclusion that the test of Riley v. Doerner had been met and that the "polestar consideration" of the best interest of the children would be served by ordering a change in custody. We cannot conclude that the chancellor was manifestly wrong in so finding, and we, therefore, affirm.

III. DID THE CHANCELLOR ERR IN DENYING MRS. CARTER'S PETITION FOR CONTEMPT?
¶ 24. The original judgment provided that Mr. Carter was to pay "monthly child support in a sum equivalent to twenty percent (20%) of his adjusted gross income, and that pursuant to statute, an Order for Withholding shall immediately issue to the Plaintiff's employer directing that said child support be immediately withheld on a monthly basis."
¶ 25. In charging Mr. Carter with contempt for nonpayment of child support, Mrs. Carter conceded that she was receiving the twenty percent from Mr. Carter's salary from his principal place of employment. (She originally charged that the employer was paying Mr. Carter partly in cash to avoid the full impact of the judgment, but that question was not preserved for review on appeal.) Mrs. Carter's claim for contempt lies in the fact that she accused Mr. Carter of having a long-standing second source of income from running a newspaper delivery route that he ignored in computing his support obligation. Her claim was that, under the terms of the judgment, she should have been receiving twenty percent of Mr. Carter's net income from this second undertaking in addition to the withholding from his wages from his principal job.
¶ 26. The chancellor resolved the issue by finding that the income from the paper route actually belonged to Mr. Carter's mother. Evidence showed that the newspaper's records listed Mr. Carter as the contract carrier and that he performed substantial services in delivering the papers; however, it was undisputed that Mr. Carter's mother also did some of the work and apparently retained all the funds derived from the operation. Mr. Carter's mother claimed that Mr. Carter did not receive any payment for his work on the paper route because she felt she had repaid him by providing housekeeping-type services to Mr. Carter on a regular basis. Nevertheless, Mr. Carter's mother admitted to paying Mr. Carter's house mortgage note in an amount of approximately $1,600 per month. The chancellor found as a matter of fact that this payment of the house note was simply a gift.
¶ 27. We find it highly unlikely that this arrangement between Mr. Carter and his mother was anything other than a scheme to conceal a fairly substantial source of income from Mrs. Carter and the two children. It seems doubtful to this Court that Mr. Carter is running his paper route *1116 without deriving some monetary benefit for his services. The chancellor in this case committed reversible error in finding otherwise.
¶ 28. The child support award guidelines as provided in Miss.Code Ann. § 43-19-101 (Rev.1993), expressly require that a non-custodial parent of two children provide twenty percent of his adjusted gross income for the support of his children. This includes twenty percent of the adjusted gross income which Mr. Carter has derived from his paper route. We are aware that Mr. Carter now has custody of his two minor children and is no longer required to pay child support directly to Mrs. Carter; however, child support obligations "vest in the child as they accrue, and no court may thereafter modify or forgive them if they be not paid." Gambrell v. Gambrell, 644 So.2d 435, 444 (Miss. 1994) (citations omitted).
¶ 29. The Mississippi Supreme Court has held that if the custodial parent has been forced to expend her own resources beyond what would have otherwise been expected of her due to the non-custodial parent's default, then she may recover the amounts so proved. Vice v. Department of Human Servs., State of Miss., 702 So.2d 397(¶ 21) (Miss.1997) (citing Varner v. Varner, 588 So.2d 428, 433 (Miss.1991)). Therefore, on remand, the chancellor must determine the amount of back child support that is due from Mr. Carter, taking into consideration his newspaper delivery route and the child support award guidelines provided in Miss.Code Ann. § 43-19-101 (Rev.1993). Then the court must determine what amount should be paid to Mrs. Carter on behalf of her children, and what amount Mrs. Carter will be allowed to keep. While child support is intended for the benefit of the children and any recovery should ordinarily be paid in trust for the children, the custodial parent may reimburse herself for the amount she was forced to pay over and above her own support obligations. Vice, 702 So.2d at 401(¶ 21) (quoting Varner, 588 So.2d at 432). Because the chancellor clearly erred in his determination that the benefit derived from Mr. Carter's paper route was not subject to his court-imposed child support obligation, we reverse and remand this case for proceedings consistent with this opinion.
¶ 30. Though we remand for further determination of amounts due for arrearages of child support based on Mr. Carter's newspaper route earnings, we feel constrained to note an evident problem in the chancellor's order setting child support. The order purported to set support as nothing more than a free-floating sum equal to twenty percent of whatever Mr. Carter's adjusted gross income might have been in the preceding pay period. It is an invitation to disaster to set child support in this manner. It permits the obligor to unilaterally cause substantial fluctuations in the support obligation by the simple act of working fewer hours, taking a less demanding and lower paying job, or quitting work altogether.
¶ 31. It cannot be treated as an escalation clause because it is equally as likely to result in a decrease in support as an increase. In Morris v. Stacy, the Mississippi Supreme Court refused to approve a support order that called for a fixed amount of child support plus an additional ten percent of the obligor's adjusted gross income exceeding $50,000 per year. Morris v. Stacy, 641 So.2d 1194, 1201 (Miss. 1994). The Court condemned the provision because of the potential for an increase in support that was not tied to the needs of the children. Id. How much more inequitable is a provision that leaves open the possibility for a decrease in support bearing no relation to the children's needs?
¶ 32. Nevertheless, despite the obvious problems with this practice, we conclude that the order must be given retroactive effect since to do otherwise could prove detrimental to innocent children who are dependent on some level of support from *1117 the non-custodial parent. However, we do admonish chancellors as to the inadvisability of setting child support in this manner and strongly suggest that, when the situation arises to enforce such an obligation retroactively, the chancellor ought to note the plain error of the order and decline to give it prospective effect, requiring rather that it be modified to set support in a definite amount.
¶ 33. Additionally, and more specifically relating to the unusual facts of this case, we note that the party now seeking recovery of the arrearage is no longer the custodial parent. Child support is not normally considered the property of the recipient parent, rather that parent is deemed to be receiving the funds in trust for the benefit of the children. Varner, 588 So.2d at 432. There is an exception to this proposition. In those circumstances where a parent no longer has custody, the former custodial parent may be entitled to retain some part of any arrearage as compensation for funds expended for the benefit of the children beyond those amounts that would reasonably be considered the appropriate part of that parent's support obligation. Id. at 433. Thus, in this case, the chancellor on remand must not only determine the amount of arrearage due on Mr. Carter's newspaper route earnings, he must also make a determination as to what part of that arrearage should be allowed directly to Mrs. Carter as reimbursement for her disproportionate contribution to the children during her period of custody. The remainder, if any, would remain the property of the children and the chancellor should, in keeping with his obligation to safeguard the children's welfare, make such provisions as are reasonably required to ensure that those additional funds are properly preserved for the benefit of the children and not Mrs. Carter.
¶ 34. THE JUDGMENT OF THE MADISON COUNTY CHANCERY COURT IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS OF THIS APPEAL ARE ASSESSED AGAINST THE APPELLEE.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, COLEMAN, AND THOMAS, JJ., CONCUR.
IRVING, LEE, AND PAYNE, JJ., NOT PARTICIPATING.