40 So.3d 602 (2009)
Melissa Ann BETTS, Appellant,
v.
Chalmus Barry MASSEY, Appellee.
No. 2008-CA-01253-COA.
Court of Appeals of Mississippi.
December 15, 2009.
Rehearing Denied May 25, 2010.
Certiorari Denied August 5, 2010.
*603 Joseph A. Kieronski Jr., Meridian, attorney for appellant.
Tanya L. Phillips, attorney for appellee.
EN BANC.
CARLTON, J., for the Court.
¶ 1. Melissa Ann Betts and Chalmus Barry Massey are the parents of Benjamin Lee Massey (Ben), a minor, born outside of wedlock on April 8, 2004. On April 3, 2008, alleging that Barry had violated a December 2005 agreed judgment of paternity and order for child support, Melissa filed a complaint in the Neshoba County Chancery Court, wherein she requested that: (1) that Barry be held in contempt for failing to return Ben, (2) a judgment for the amount that Barry was in arrearage for child support, (3) primary custody of Ben, and (4) reasonable attorney's fees. Barry filed an answer and counter-complaint for custody and child support. Following a hearing, the chancery court awarded primary custody to Barry and visitation to Melissa. Feeling aggrieved, Melissa appeals and asserts that the chancellor erred in finding that a material change in circumstances had occurred and that the chancellor improperly analyzed the Albright factors.[1]
*604 ¶ 2. We find substantial evidence in the record to support the chancellor's finding that a material change in circumstances had occurred and that his analysis under Albright necessitated a change in custody.

FACTS
¶ 3. On December 9, 2005, approximately twenty months after Ben's birth, Melissa and Barry entered into an "Agreed Judgment of Paternity and Order of Child Support and Other Relief." The parties agreed to joint legal custody, and Melissa received primary physical custody. Barry received reasonable visitation and agreed to make monthly child support payments of $352. Approximately two months later, in February 2006, Melissa began working as a bartender on the night shift at a casino. Therefore, it became impossible for her to personally provide care for Ben at night. As a result, Ben often stayed with Barry and his wife, Natalia. The parties managed to work together to provide for Ben while Melissa worked, that is, until March 10, 2008, when bruises were discovered on Ben's buttocks.
¶ 4. The record reflects that in the afternoon on Saturday, March 8, 2008, Natalia picked Ben up from Melissa, so Melissa could go to work.[2] Ben remained in Natalia's care for the remainder of the day and night. Then, at approximately 1:00 a.m., Natalia sent Melissa a text message informing her that Ben had awoken and would not go back to sleep. Because Natalia had to go to work later that morning, she asked Melissa to come and get Ben when her shift ended. Melissa arrived to pick Ben up at approximately 4:00 a.m. Ben remained in Melissa's care until approximately 9:30 a.m. At that point, Melissa took him to visit Barry's brother, Craig Massey, and Craig's wife, Malia, at their house. Ben remained there until approximately 3:00 p.m., at which time Megan Howington, Ben's babysitter, picked him up from Craig and Malia's house and took him to Melissa's house. That night, Melissa's boyfriend, Jerry Bailey, noticed bruises on Ben's buttocks when he took Ben to the bathroom. He immediately informed Melissa of his discovery. Melissa looked at the bruises but did not thoroughly examine Ben at that time. It was not until the following morning that Melissa, upon closer examination of the bruises, became alarmed and took Ben to visit his pediatrician, Dr. Melody Byram. Dr. Byram concluded that Ben had suffered moderate to severe bruising that had occurred within thirty-six hours of her examination.
¶ 5. Melissa allowed Ben to stay with Barry the following weekend. However, Barry failed to return Ben to her care as they had agreed. As a result, on March 20, 2008, Melissa filed a writ of habeas corpus in a separate action, Cause No.2008-148. Barry filed an answer and a motion for appointment of guardian ad litem. On March 27, 2008, the chancery court entered an order finding that the Mississippi Department of Human Services (DHS) should be immediately given temporary legal and physical custody of Ben. The chancery court ordered DHS: (1) to investigate the allegations of abuse, (2) to ensure that Ben was put in family placement while the matter was investigated, and (3) to arrange reasonable visitation for Melissa and Barry. The chancery court also ordered that any further matters concerning Ben, including any request for appointment of a guardian ad litem, be filed in Cause No. 2005-0323, the original action in which paternity, child support, *605 and custody were determined and adjudicated.
¶ 6. On April 3, 2008, Melissa filed the complaint referenced in the beginning of this opinion, and Barry filed an answer and counter-complaint, also referenced earlier in this opinion. Melissa averred that a material change in circumstances had occurred that had adversely affected Ben. In his answer, Barry agreed that a material change in circumstances had occurred.
¶ 7. On April 11, Barry filed a motion for temporary custody and for appointment of a guardian ad litem. On April 28, the parties entered into an agreed order appointing D. Joseph Kilgore as guardian ad litem. Ben remained in the care of DHS until April 11. He was then placed in the custody of Melissa's mother, Nancy Kubin.
¶ 8. The case was heard in June 2008. At the hearing, Dr. Byram testified that her examination of Ben led her to conclude that Ben had been beaten with an object. She also testified that hand prints were clearly visible on Ben's buttocks. According to Dr. Byram, the bruises were caused by "some sort of excessive squeezing-type injury." Dr. Byram recalled that she had had trouble understanding Ben and had concluded that Ben does not communicate on the level of most three-year-olds. Dr. Byram stated that Ben did not respond when she asked him who had caused the bruises.
¶ 9. Judy Ward served as Ben's foster mother while he was in the custody of DHS. She testified that Ben often asked for his father but never for his mother. She described Ben as "pitiful wanting his daddy." Ward stated that, as a result, she contacted DHS and requested that Barry be allowed to call Ben every night. DHS granted her request. Ward testified that she did not make a similar request on Melissa's behalf. Ward recalled that on at least one occasion Melissa called to check on Ben. Ward also stated that Melissa spoke with someone at DHS on a couple of occasions and asked how Ben was doing.
¶ 10. Carrie Cumberland, a social worker with DHS, testified that as part of their investigation, DHS conducted in-house monitoring at Melissa's and Barry's homes from March 10-25, 2008. While the investigation was ongoing, Barry and Melissa were allowed supervised visitation with Ben at DHS and were required to come to DHS to visit Ben, even after he was placed in Kubin's care. DHS found both Barry's and Melissa's homes adequate. However, Cumberland testified that she recommended that Ben be placed in Barry's primary care, mainly because of Ben's desire to spend time with his father. She concluded that Barry, more so than Melissa, has Ben's best interest at heart. Cumberland stated that "Melissa tends to just be upset with me and [does] not really think about what's going on with Ben in certain issues." Cumberland testified that DHS never established who inflicted the bruises upon Ben.
¶ 11. Megan testified that she began babysitting Ben when he was eighteen months old and that she lived with Melissa in 2007 from August to November. During this time, Megan kept Ben four or five nights a week while Melissa worked from 6:00 p.m. to 2:00 or 3:00 a.m. Megan testified that she never saw any bruising or unusual markings on Ben during the time that she kept him. According to Megan, Natalia or Kubin kept Ben when she was unable to do so. Barry's attorney posed the following question to Megan: "What would you say if Barry and Natalia have been keeping records of how often Ben stayed at their home, and August, September, October, November they had Ben 22 nights in 30 days each month?" Megan responded by saying that the statement *606 was not true. Megan explained that she last baby-sat Ben in late November 2007.[3] She stated that she then began working the night shift and was not available to baby-sit Ben.
¶ 12. Melissa's mother Kubin testified that a distraught Melissa informed her that she had discovered the bruises on Monday, March 10, 2008, and that she accompanied Melissa and Ben to Dr. Byram's office. Kubin stated that Melissa called everyone who had been in recent contact with Ben and inquired whether they knew how he had received the bruises. Further, Kubin disputed that Ben was in Barry's care twenty-two out of thirty days in any given month.
¶ 13. Melissa's brother, Bryant Betts, and his fiancee, Amber Grubinski, live with Kubin and were approved by DHS to care for Ben while he was in Kubin's primary care. Bryant stated that Melissa has a good relationship with Ben and that he had never witnessed her strike Ben. Specifically, he only recalled witnessing Melissa discipline Ben verbally rather than physically. Bryant further stated that he has never observed Barry discipline Ben.
¶ 14. Melissa testified that she is employed as a bartender by Pearl River Resort in Philadelphia, Mississippi, and had worked the night shift (6:00 p.m. to 2:00 a.m.) five days a week from 2006 to 2008, but she had recently begun working from 9:00 a.m. to 5:00 p.m. She explained that Megan, Natalia, and Kubin cared for Ben while she worked. She also stated that Barry kept Ben whenever his work schedule allowed him to do so. Melissa testified that, prior to this incident, she had a good relationship with Barry and Natalia. Melissa agreed with Megan that there were instances when Megan kept Ben approximately five nights per week. According to Melissa, Megan was Ben's primary caretaker at this time. Melissa stated that Megan kept Ben on such a frequent basis because Barry "would not agree to do certain things." Melissa strongly disagreed that Ben stayed overnight with Barry twenty-two days a month, and she stated that "there was no possible way for him to be there for 22 days out of the month when I was paying a babysitter to come to my house and watch my son three to four days a week." Melissa agreed that Ben stayed with Barry much more than was outlined in their custody agreement, but she stated that this was because Barry thought it was in Ben's best interest for him to stay overnight at Barry's residence when Melissa was working, rather than Melissa picking Ben up during the early morning hours. Melissa stated that, as a result, Ben usually stayed overnight at Barry and Natalia's house a couple of nights a week. After Megan stopped babysitting Ben, Melissa depended on her mother and Natalia for assistance. Melissa stated that, although Ben was with Barry on some occasions, Natalia was Ben's primary caretaker.
¶ 15. As for the events that led to Melissa's discovery of the bruises, she recalled that Ben was with Megan for approximately three hours after she picked him up from Craig and Malia's residence. She further stated that she did not notice any bruises on Ben before Jerry brought it to her attention on Sunday night, March 9, 2008.
¶ 16. According to Melissa, as soon as she realized the severity of Ben's bruises, on March 10, 2008, she took him to Dr. Byram's office. Melissa recalled that Natalia *607 and Natalia's two sons "showed up" as Melissa, Kubin, and Ben were leaving Dr. Byram's office. Then, according to Melissa, they all went to a restaurant before going to the Philadelphia Police Department. Melissa stated that she did not go to work the two days that followed so that she could stay with Ben. She then stated that she allowed Ben to go camping with Barry in Pelahatchie, Mississippi that weekend.[4] Melissa testified that she and Jerry picked Ben up from Barry's house on Sunday afternoon, but she brought him back to spend the night with Barry because she had to work that night. According to Melissa, Barry took Ben to a forensic interview that Monday, March 17, after telling her that he was going to bring him home. Melissa testified that Barry had agreed to bring Ben to her home the following day, but he failed to do so. Melissa further testified that when Ben finally returned home after being with Barry, he said: "Momma spanked me." Melissa testified that she has paddled Ben on "very few occasions," but no markings were ever left on Ben afterward.
¶ 17. Malia testified that Ben spends "a good amount of time" with Barry and Natalia because of Melissa's work schedule. However, she stated that Ben is with Melissa on days that Melissa does not have to work. Malia also stated that she had baby-sat Ben for Barry and Natalia when they had to work. According to Malia, Barry works out of town a couple of days a week; therefore, Natalia often has Ben during this time. Malia testified that, although she considers Ben as having a closer relationship with Barry, Ben has a good relationship with Melissa as well.
¶ 18. Barry's wife, Natalia, testified that she sees Ben at least five to six times a week. When asked why she keeps Ben so frequently, Natalia responded that Ben is with her so often either because Melissa has to work or because Melissa "would like to do something else." Natalia recalled that, in addition to keeping Ben while Melissa is at work, she has kept Ben while Melissa took karate lessons, attended the Dixie National Rodeo, and went on weekend trips to New Orleans, Louisiana. Natalia stated that in April 2006 she and Barry decided to use a calendar to keep track of how often Ben was in their care. She testified: "I have a computer at my home with a calendar. And every night that he was there we would type it in that he was there or every day."[5] Natalia acknowledged that Barry would frequently be away from home when he was working as a long-distance driver. However, she stated that he stopped long-distance driving in September 2007.
¶ 19. Natalia described her role in DHS's investigation into the matter. She testified that she took a polygraph test and that she and Barry were in the process of taking parenting classes.[6] She also stated that she has not spoken with Melissa since March 2008. Natalia stated that she usually disciplined Ben by talking to him, but on occasion, she "spatted him on the butt." She explained that she always used her open hand and never used an object. She also stated that she did not strike Ben during the weekend of March 7-9, 2008. Further, she testified that Ben did not complain of being in any pain that weekend *608 and that she did not notice any bruises on Ben when she bathed him.
¶ 20. Barry testified that he and Natalia began keeping record of how often Ben was in their care because he "tried to get [Melissa] to step up to the plate as a momma [but] she wouldn't do it." Further, Barry admitted that he did not return Ben per his agreement with Melissa. According to Barry, he did not return Ben because he was waiting on further instructions from DHS.
¶ 21. Barry claims that, on at least one occasion, Melissa violated the rules regarding her supervised visitation while Ben was in the custody of DHS. Barry alleged that Melissa did not comply with the DHS rules by having contact with Ben outside of the supervised visitation implemented by DHS. Barry refers to two specific instances. First, Barry testified that Melissa rode in the car when Bryant took Ben to DHS for his visitation with Barry. Second, Barry stated that, on one occasion, he heard Melissa in the background when he called Kubin's house to speak with Ben.[7]
¶ 22. Kilgore, the guardian ad litem appointed to represent Ben, testified about what led him to conclude that it is in Ben's best interest for him to be in Barry's primary custody. As it relates to Melissa's relationship with Jerry, Kilgore testified that Melissa denied that Jerry lived in her residence, but she admitted that he "stayed there a pretty good bit." Also, regarding Ben's sleeping arrangements, Kilgore testified that Ben sleeps in the bed with Melissa and Jerry from time to time. Further, Kilgore acknowledged that Ben regularly sleeps with Barry and Natalia.
¶ 23. Kilgore stated that he worked with DHS to increase Barry's visitation privileges while Ben was in foster care. Kilgore testified that he saw no problem with Barry's visitation privileges being increased, because none of the investigators believed that Ben would be subjected to harm while at Barry's home. However, he stated that, to his knowledge, the findings as they related to Melissa's home were inconclusive. Kilgore concluded that Ben's best interest is better served by being placed in Barry's primary care. He stated the following:
I just feel that [Barry and Natalia] have a more stable atmosphere, a family-type atmosphere where the concern revolves around Ben and the other kids. It's and by instability, I'm not talking about the moving around or anything. They both did I think [sic] the same number of times. And nothing [sic] wrong with either one of them's [sic] house.
But just apparently [Melissa] flies right into the relationship with at least ... three men. And her working hours certainly don't show a priority to Ben in my opinion. Just the general demeanor that it's war against everybody, and I'm just not seeing as much concern about Ben that you [sic] did with Barry. The relationship that everyone talks about [is Barry's relationship with his son]and I could see it face to face with Barry, his concern with him, his love for his son, and his dedication to him and wanting him to grow up to be a man.
Barry's attorney posed this question to Kilgore: "What is different in this case about [Melissa's] employment?" Kilgore responded by saying:
Well, the employment was from six o'clock in the evening to three o'clock the next morning. That's most of the evening that she was with the child. I *609 find it hard to believe that she couldn't change her hours [before] but could two weeks before court. I think that it justit's notlike I told [Melissa's attorney], it's not just that. It's just the whole picture. It's the whole priority and the picture painted of the two households.
¶ 24. Following the hearing, the chancellor issued an opinion wherein he awarded Barry primary custody. He then entered a judgment modifying the custody agreement entered on December 9, 2005, to reflect that legal and physical custody of Ben be awarded to Barry. It is from this decision that Melissa now appeals.
¶ 25. Additional facts, as necessary, will be relayed during our analysis and discussion of the issues.

DISCUSSION
¶ 26. It is well settled that a chancellor's findings of fact that are supported by substantial evidence will remain undisturbed on appeal "unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." Sanderson v. Sanderson, 824 So.2d 623, 625-26(¶ 8) (Miss.2002) (quoting Kilpatrick v. Kilpatrick, 732 So.2d 876, 880(¶ 13) (Miss.1999)).

1. Modification
¶ 27. In her first issue, Melissa asserts that the chancellor erred in finding that a material change in circumstances existed which warranted a modification of custody. To address this issue, we must examine the chancellor's findings. In stating that the parties agreed that a material change in circumstances adversely affecting the child had occurred, the chancellor found that a material change in circumstances had occurred because "both parties filed pleadings, alleging that a material change in circumstances adverse to the child had occurred." The chancellor further stated:
They disagreed as to the application of the best-interest test, both agreed that a material change had occurred and that it adversely affected the child. As to the material change that adversely affects the child, the Court concludes that Ben already spends most nights with his father and step-mother which the Court finds to be a de facto change of custody with the mother's consent. In addition, Melissa's work hours of the past two (2) weeks have changed to a more conventional 9:00 a.m. to 5:00 p.m. Before that time, she worked from 6:00 p.m. to 2:00 a.m. which was not a schedule conducive to raising a small child as a single parent. Finally, Melissa now finds herself four (4) months pregnant by a man she began dating six (6) months ago. She admits that on occasions she and her boyfriend have allowed Ben to sleep in bed with them which the Court finds to be further evidence of a material change that adversely effects [sic] this child.
¶ 28. Melissa challenges the chancellor's findings that: (1) there had been a "de facto change of custody"; (2) her work schedule until shortly before the hearing was not conducive to raising a small child; and (3) her being four months pregnant by Jerry, whom she had only been dating for six months, had an adverse affect on Ben. We conclude that the record supports the chancellor's finding that a material change in circumstances had occurred.[8]
*610 ¶ 29. In 4 Deborah H. Bell, Divorce and Domestic Relations, Encyclopedia of Mississippi Law § 28:14 at 220 (Jeffery Jackson & Mary Miller ed.2001), at 220, Professor Deborah Bell notes that in most cases, "after custody has been awarded to one parent ... modification is only allowed upon a showing of a material change in circumstances adversely affecting the welfare of the child, and a showing that a change of custody is in the best interest of the child." However, if there is proof that since the original custody order, the child is living in adverse circumstances in the custodial parent's home, then "the moving party need to show only the existence of the adverse circumstances and that a change is in the best interest[] of the child." Id.; see Carter v. Carter, 735 So.2d 1109, 1114-15(¶ 21) (Miss.Ct.App.1999).
¶ 30. The dissent finds fault with the weight the chancellor placed upon the fact that Melissa worked the night shift at a casino, in regards to finding a material change of circumstances. However, the record also contained additional evidence of circumstances adverse to the child. The guardian ad litem found that Melissa's judgment, general demeanor, and lack of motherly concern resulted in instability for the child. Melissa also allowed her romantic interests to stay overnight, and she was unwed and pregnant at the time of trial. However, the record reflects that Barry and his son radiated a connection apparent to the observer. Ben's foster mother, while he was in the custody of DHS, testified that Ben often asked for his father, but not his mother.
¶ 31. The dissent also concludes that Ben has not suffered any adverse effect from sleeping in the bed with Melissa and Jerry, though Jerry and Melissa were not married at the time.[9] To say that the child has not been harmed by sleeping with his mother and Jerry is beyond our able determination today. It is not necessary for this Court to dwell on a comparison in judgment and stability of the home environment of this three-year-old child sleeping with his mother and her boyfriend as opposed to his natural father and his lawfully-wedded stepmother.[10] That is a factual determination best left to the chancellor. This Court stated the following in Carter:
The resolution of disputed questions of fact is a matter entrusted to the sound discretion of the chancellor. Murphy v. Murphy, 631 So.2d 812, 815 (Miss.1994). On appeal, we are limited to searching for an abuse of that discretion; otherwise, our duty is to affirm the chancellor. Id. Our job is not to re[-]weigh the evidence to see if, confronted with the same conflicting evidence, we might decide the case differently. Rather, if we determine that there is substantial evidence in the record to support the findings of the chancellor, we ought properly to affirm.
Carter, 735 So.2d at 1114(¶ 18).
¶ 32. The record also reflects that a question remains regarding who inflicted the severe bruising on the child. Ben's pediatrician testified that Ben's speech had not developed to a level where he could explain who had inflicted the abuse or the circumstances behind the abuse. However, a court need not wait until a child is injured before a change in custody is granted, where the circumstances are adverse to the child and the parent has exhibited *611 poor parental judgment. Riley v. Doerner, 677 So.2d 740, 744 (Miss.1996). Thus, the chancellor must make his factual determinations based upon the totality of the circumstances, including the recommendations of the guardian ad litem and testimony from a range of witnesses, including testimony by the DHS worker and foster mother. We cannot find the chancellor in error simply because one factor, Ben's sleeping arrangements, has not yet resulting in any reported injury or harm. Rather, we must affirm the chancellor because his decision to award legal and physical custody of Ben to his father is supported by substantial evidence in the record based on the totality of the circumstances.
¶ 33. This issue lacks merit.

2. Albright Analysis
¶ 34. Melissa further contends that the chancellor incorrectly weighed the Albright factors in his analysis. Melissa argues that if the chancellor had correctly analyzed the facts of her case under Albright, he would have found that Ben should remain in her custody.
¶ 35. It has long been established that "the polestar consideration in child custody cases is the best interest and welfare of the child." Albright, 437 So.2d at 1005. The following factors are used to determine what is in the child's best interests: (1) age, health, and sex of the child; (2) a determination of the parent who had the continuity of care prior to the separation; (3) which parent has the best parenting skills and which has the willingness and capacity to provide primary childcare; (4) the employment of the parent and the responsibilities of that employment; (5) the physical and mental health and age of the parents; (6) the emotional ties of parent and child; (7) the moral fitness of the parents; (8) the home, school, and community record of the child; (9) the preference of the child at the age sufficient to express a preference by law; (10) the stability of the home environment; and (11) other factors relevant to the parent-child relationship. Id.
¶ 36. After finding that a material change in circumstances had occurred, the chancellor proceeded to conduct an Albright analysis to determine whether it was in Ben's best interest to modify primary custody from Melissa to Barry. The chancellor analyzed each factor as follows.

(a) Age, Health, and Sex of the Child
¶ 37. Ben was three years old at the time of the hearing. There was testimony that Ben does not communicate at the level of most three-year-olds, and Ben's social worker, Cumberland, reported that Ben could possibly be suffering from a mild form of autism. The chancellor found that this factor favors neither Melissa nor Barry.

(b) Continuity of Care
¶ 38. Melissa had primary custody of Ben since the time that he was born until he was placed in foster care. Even though Melissa disputes the accuracy of the calendar that Barry and Natalia contend reflects the amount of time that Ben was in their care, she does not dispute that several people assisted her in caring for Ben while she worked. The chancellor found that this factor does not favor either Melissa or Barry.

(c) Parenting Skills
¶ 39. The chancellor stated that Melissa and Barry have adequate parenting skills and found that this factor does not favor either party.

*612 (d) Willingness and Capacity to Provide Primary Child Care

¶ 40. The chancellor noted that although Melissa and Barry appear to be willing to provide primary care, the capacity to provide primary care rests more with Barry because of Melissa's past work schedule. Accordingly, the chancellor found that this factor favors Barry.

(e) Employment and Responsibilities of Employment
¶ 41. The chancellor found that this factor favors neither Melissa nor Barry, but he noted that "[t]wo (2) weeks ago this factor would have strongly favored the father."

(f) Physical and Mental Health and Age of the Parents
¶ 42. The chancellor found that this factor favors neither Melissa nor Barry.

(g) Emotional Bond Between Parent and Child
¶ 43. The chancellor noted that the evidence establishes that Ben has a close relationship with Melissa and Barry. However, the chancellor found that there was overwhelming evidence that Ben has the strongest emotional tie to Barry. Thus, he found that this factor favors Barry.

(h) Moral Fitness of the Parents
¶ 44. The chancellor found that this factor favors Barry, after noting that "Melissa allows Ben to sleep in the bed with her and her boyfriend which demonstrates poor moral character in the direct presence of the child."

(i) Home, School, and Community Record
¶ 45. The chancellor found that this factor favors neither Melissa or Barry.

(j) Preference of the Child
¶ 46. Ben is too young to express a preference regarding which parent he would rather live with. The chancellor concluded that this factor favors neither Barry nor Melissa.

(k) Stability of the Home Environment
¶ 47. Melissa testified that she had recently moved into a new three-bedroom home and that she planned to marry Jerry in the near future. She also testified that there would be sufficient space for their growing family. The chancellor noted that Kilgore's recommendation that Barry be awarded primary custody was based on several factors, including that "the Massey home life revolves around Ben and child upbringing." The chancellor found that this factor favors Barry.

(1) Stability of the Employment
¶ 48. The chancellor found that this factor favors Melissa because she has remained with the same employer for over two years, while Barry has frequently changed jobs.
¶ 49. We find substantial evidence in the record to support the chancellor's analysis of the Albright factors. This issue is without merit.

CONCLUSION
¶ 50. We find substantial evidence in the record to support the chancellor's judgment that a material change in circumstances occurred and that custody of Ben should be placed with his father, Barry. We find no abuse of discretion in the chancellor's judgment and, therefore, affirm.
¶ 51. THE JUDGMENT OF THE NESHOBA COUNTY CHANCERY *613 COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., ROBERTS AND MAXWELL, JJ., CONCUR. IRVING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRIFFIS, BARNES AND ISHEE, JJ.
IRVING, J., DISSENTING:
¶ 52. I believe that the majority errs in affirming the chancellor's decision to modify the custody provisions of the original judgment, which granted Melissa Betts physical custody of Ben, the parties' minor son. Therefore, I respectfully dissent. I would reverse and render the judgment transferring Ben's custody from Melissa to Barry Massey, as I find the evidence totally insufficient to support a finding that, since the initial judgment, a material change in circumstances has occurred that adversely affects Ben's well-being. In fact, as I will explain, the chancellor made no attempt, on the evidence presented, to determine if a material change in circumstances had occurred.
¶ 53. The record reflects that the chancellor found that a material change in circumstances had occurred because "both parties filed pleadings, alleging that a material change in circumstances adverse to the child had occurred." The chancellor further stated:
They disagreed as to the application of the best interest test, both agreed that a material change had occurred and that it adversely affected the child. As to the material change that adversely affects the child, the Court concludes that Ben already spends most nights with his father and step-mother which the Court finds to be a de facto change of custody with the mother's consent. In addition, Melissa's work hours of the past two (2) weeks have changed to a more conventional 9:00 a.m. to 5:00 p.m. Before that time, she worked from 6:00 p.m. to 2:00 a.m. which was not a schedule conducive to raising a small child as a single parent. Finally, Melissa now finds herself four (4) months pregnant by a man she began dating six (6) months ago. She admits that on occasions she and her boyfriend have allowed Ben to sleep in bed with them which the Court finds to be further evidence of a material change that adversely effects [sic] this child.
¶ 54. The record reveals that Barry did not affirmatively plead in his counter-complaint for custody and child support that a material change in circumstances that had adversely affected Ben had occurred. In her complaint seeking a citation of contempt against Barry, and for other relief, Melissa alleged that "[t]here has been a material change in circumstances adverse to the minor child and it is in the best interest of the child that Melissa should have complete custody of the child." In his answer to Melissa's complaint, Barry admitted that there had been a material change in circumstances adverse to Ben, but denied that it was in Ben's best interest for complete custody to be given to Melissa. While Melissa did not specify what the material change was, it is crystal clear that the change that she was referring to was Barry's refusal to return Ben to her on March 18, 2008, after she had asked him to baby-sit Ben while she was at work. Therefore, it cannot be legitimately argued that the parties agreed that Barry's refusal to return Ben to Melissa was the material change, adversely affecting Ben, that warranted modification of the joint custody provision, because there is no doubt that Barry did not intend to agree that his own actions had adversely affected Ben.
*614 ¶ 55. In McSwain v. McSwain, 943 So.2d 1288, 1292(¶ 15) (Miss.2006) (quoting Mabus v. Mabus, 847 So.2d 815, 818(¶ 8) (Miss.2003)), our supreme court held that:
In a modification proceeding, the burden is on the non-custodial parent to prove by a preponderance of the evidence: "(1) that a substantial change in circumstances has transpired since issuance of the custody decree; (2) that this change adversely affects the child's welfare; and (3) that the child's best interests mandate a change of custody."
Further, chancellors should consider the totality of the circumstances when making this determination, and if, by looking at the totality of the circumstances, it can be said that a change has occurred: "the court must separately and affirmatively determine that this change is one which adversely affects the children." Mabus, 847 So.2d at 818(¶ 8) (quoting Bredemeier v. Jackson, 689 So.2d 770, 775 (Miss.1997)).
¶ 56. It is exceedingly clear, from the quoted portion of the chancellor's opinion, that he simply accepted Melissa's representation, and Barry's affirmance of that representation, that a material change in circumstances that adversely affected Ben had occurred. Since Barry was seeking a change of the custody provision, it was incumbent upon him to affirmatively plead and prove that a material change in circumstances had occurred and that this change had adversely affected Ben. He did neither.
¶ 57. A casual perusal of Barry's counter-complaint leaves no doubt that he did not plead that a material change in circumstances had occurred. Therefore, procedurally, he did not place himself in a position where he could be awarded the relief that he was requesting. This fact aside, the record is devoid of any evidence that a material change in circumstances had occurred. As stated, the chancellor did not make an independent finding that a material change in circumstances had occurred. I have already discussed the fallacy in the chancellor's assertion that the parties, by their pleadings, mutually agreed that a material change in circumstances had occurred. After erroneously finding that the parties had agreed that a material change in circumstances had occurred, the chancellor then compounded his errors. As stated, the chancellor opined:

As to the material change that adversely affects the child, the Court concludes that Ben already spends most nights with his father and step-mother which the Court finds to be a de facto change of custody with the mother's consent. In addition, Melissa's work hours of the past two (2) weeks have changed to a more conventional 9:00 a.m. to 5:00 p.m. Before that time, she worked from 6:00 p.m. to 2:00 a.m. which was not a schedule conducive to raising a small child as a single parent. Finally, Melissa now finds herself four (4) months pregnant by a man she began dating six (6) months ago. She admits that on occasions she and her boyfriend have allowed Ben to sleep in bed with them which the Court finds to be further evidence of a material change that adversely effects [sic] this child.

(Emphasis added). In the above passage, it is clear that the chancellor finds that Melissa's allowing the child to spend extra time with his father, while she works to support the child and herself, has adversely affected the child. This is distorted reasoning. Allowing a child to spend lots of time with one of his natural parents can never be deemed to be an adverse effect on the child, unless the parent with whom the child is spending the extra time is unfit to care for the child. Surely, the chancellor was not finding that Barry was unfit to spend the extra time with Ben. That being *615 the case, how can it be legitimately said that Melissa's allowing Ben to stay with Barry, while she worked, adversely affected Ben?
¶ 58. Then the chancellor finds that Melissa's allowing Ben to sleep with her and her boyfriend on one or two occasions is further evidence of a material change that adversely affects Ben. This finding is equally baffling, as there is absolutely no evidence that Ben was exposed to any unsavory activity between Melissa and her boyfriend during the one or two nights that he was allowed to sleep with them. Ben sleeps regularly with Barry and his wife. However, the chancellor did not find fault with that arrangement. Is the difference a moral one? If so, is this not an improper weighing of the Albright factors, as the moral fitness of the parent is only one factor that must be considered along with the others? A custody decision cannot be based on one factor. No one factor is dominant. It is sufficient to say that the record contains no evidence of any adverse effect on Ben as a result of any of the choices made by Melissa in her personal life. Moreover, the sleeping incident occurred only once or twice, while the sleeping arrangement between Ben, his father, and his father's wife is ongoing.
¶ 59. In his discussion of the material change in circumstances that had adversely affected Ben, the chancellor did not discuss the one incident regarding the bruises that were found on Ben's buttocks. Therefore, I see no need to address that incident in any detail. There is absolutely no proof in the record as to who was in charge of Ben when the bruises occurred. Therefore, it would be inappropriate to attempt to assess fault with regard to the bruises. Suffice it to say that the weight of the evidence does not point any more toward Melissa than it does toward others who had been in charge of Ben within the twenty-four hour period prior to the bruises being discovered. Further, there is no evidence that this one incident reflects any kind of a pattern of physical abuse, or that it will ever occur again.
¶ 60. Finally, I must say that the chancellor's decision to penalize Melissa for working to support herself and Ben, and for allowing Ben to spend time with his father while she worked, sends the wrong signal to single parents and is not in the best interests of their minor children. Believing that she/he may ultimately be penalized for doing so, a single, working parent who is given custody of her/his child may be unwilling to allow the child to spend any more time with the non-custodial parent than is required in the custody order. This would be a normal, natural, and understandable reaction unless the custodial parent did not care about maintaining custody of her/his child. It is always in the best interests of minor children to be allowed to spend as much time as possible with their parents and especially with a caring, non-custodial parent. When parents are separated and attempting to raise their children together, the courts should be careful never to do anything that may inhibit that process.
¶ 61. For the reasons presented, I dissent.
GRIFFIS, BARNES AND ISHEE, JJ., JOIN THIS OPINION.
NOTES
[1] In Albright v. Albright, 437 So.2d 1003, 1005 (Miss. 1983), the Mississippi Supreme Court set forth factors that chancellors must consider when determining which parent should be awarded primary custody of a child.
[2] Barry was working out of town at this time but returned shortly after he was notified of the bruises.
[3] We note that Megan testified that she did not baby-sit Ben after November 2007; therefore, we assume that she does not consider picking Ben up from Craig and Malia's house and taking him home as babysitting.
[4] Barry recalled that the camping trip was the Friday before the bruises were discovered.
[5] A copy of the computer printout was admitted into evidence.
[6] Melissa and Jerry also took parenting classes and had completed their classes by the time of the hearing. Further, the record reveals that Melissa was not allowed to take a polygraph test because of her pregnancy.
[7] Melissa, Kubin, and Bryant dispute Barry's allegations that Melissa violated any of the rules prescribed by DHS.
[8] Curiously, Melissa filed the initial complaint alleging that a material change in circumstances occurred which warranted a change in the joint custody arrangement she had with Barry. She now claims that the chancellor erred in finding that a material change in circumstances in fact occurred.
[9] Notably, at the time of the hearing at issue in this case, Melissa had engaged in at least three romantic relationships since the custody order.
[10] The record indicates that due to developmental speech delays, Ben cannot tell us how he has been affected by this situation.